✓ FILED          ___ LODGED
___ RECEIVED     ___ COPY

MAR 3 1 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1  Lon R. Leavitt
2  HALUNEN LAW
   Arizona Bar No. 35825
3  One Renaissance Tower
   Two North Central Avenue, Suite 1800
4  Phoenix, Arizona 85004
5  Telephone: (602) 254-6494
   Fax: (612) 605-4099
6  leavitt@halunenlaw.com
7
8  Susan M. Coler*
   HALUNEN LAW
9  80 South 8th Street, Suite 1650
   Minneapolis, Minnesota 55402
10 Telephone: (612) 605-4098
11 Fax: (612) 605-4099
   coler@halunenlaw.com
12 (* *pro hac vice* application forthcoming)
13
   *Attorney for Plaintiff/Relator Craig Thomas*
14

SEALED

15           **UNITED STATES DISTRICT COURT**

16              **DISTRICT OF ARIZONA**

17
18 United States of America *ex rel.* Craig      Case No.:   **CV22-00512-PHX-JFM**
   Thomas,
19                                                **COMPLAINT FOR**
           Plaintiff/Relator,                     **VIOLATIONS OF THE FALSE**
20                                                **CLAIMS ACT, 31 U.S.C. §§ 3729,**
                                                  ***et seq.***
21              v.
22 Mercy Care, Touchstone Behavioral Health       **JURY TRIAL DEMANDED**
   dba Touchstone Health Services, Southwest
23 Network, Spectrum Healthcare Group, Inc.,      **FILED UNDER SEAL**
   Southwest Behavioral & Health Services,        **PURSUANT TO 31 U.S.C.**
24 and April Rhodes,                              **§ 3730(b)(2)**
25
26         Defendants.
27
28

Since at least 2012, Defendants, providers of health services to Arizona residents, received millions of dollars in payments—a substantial portion of which Defendants were not entitled to obtain or retain and, instead, converted to their own benefit—from Arizona's Medicaid Program, the Arizona Health Care Cost Containment System ("AHCCCS"). These payments are substantially funded by Arizona and the federal government through the Centers for Medicare and Medicaid Services ("CMS").

Defendants include Mercy Care, which has a direct contract with AHCCCS. The other defendants are four non-profit corporations that contract with Mercy Care or Cenpatico to provide services and April Rhodes (together, the "Contractor Defendants"). Mercy Care, including Mercy Care RBHA, and the Contractor Defendants engaged in a scheme to avoid reimbursing unspent deferred revenue funds to AHCCCS and CMS in violation of (a) federal law, including CMS regulations; (b) AHCCCS's Financial Reporting Guidelines; (c) Mercy Care's Financial Reporting Policy; and (d) individual contractual obligations.

The false claims and false statements Defendants submitted as part of this scheme, together with the government funds they failed to repay and, instead, converted to their own benefit, form the basis of this action, which *qui tam* plaintiff and relator Craig Thomas ("Relator") brings pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), on his own behalf and on behalf of the United States of America. Specifically, Relator brings this action against Defendants for treble damages, statutory penalties, and other relief arising from Defendants' false, fraudulent, and improper claims and conduct. The causes of action asserted in this complaint are based on the facts and information set forth below.

## I.      NATURE OF THE ACTION

1.      This case is about how Mercy Care and the Contractor Defendants treated overpayments that occurred in the distribution of funds from CMS to AHCCCS to Mercy Care or Cenpatico and then to the Contractor Defendants. In this way, Defendants violated the FCA and obtained and converted to their own benefit federal funds to which

1  they were not entitled.

2      2.      Relator has personal, substantial, firsthand knowledge of Defendants'

3  schemes.

4      3.      Relator is not aware that Defendants ever disclosed, refunded, or otherwise

5  corrected the overpayments they received.

6      4.      Relator reported this misconduct to his employer, but the company ignored

7  those concerns and continued with its fraud.

8      5.      As discussed below, Relator seeks recovery for Defendants' FCA violations

9  from March 31, 2012, through the present.

10  **II.    PARTIES**

11      **A.    Relator**

12      6.      Relator Craig Thomas is a resident of Arizona and is the Chief Operating

13  Officer of Touchstone Behavioral Health dba Touchstone Health Services,[1] a position he

14  has held since December 2016.  Relator is a well-respected healthcare executive who

15  earned a B.S. in Psychology from Missouri State University and an M.B.A. from Keller

16  Graduate School of Management.  He is a Certified Healthcare Compliance Professional

17  and a Certified Healthcare Privacy Compliance Professional through the Health Care

18  Compliance Association.  Relator is also a Certified Professional Coder through the

19  American Academy of Professional Coders.  Relator has a strong background in

20  compliance and auditing.

21      7.      Relator brings this matter on behalf of the United States under the FCA.

22  The United States acts through its various agencies and departments, including the

23  Department of Health and Human Services ("HHS") and CMS.

24      **B.    Defendants**

25      8.      Mercy Care is an active Arizona domestic nonprofit corporation

26  incorporated on November 26, 1985.  According to Arizona Secretary of State filing

27  _____

28  [1] References to "Touchstone" include Touchstone Behavioral Health and Touchstone
   Health Services.

records, the President and CEO of the company is Lorry Bottrill. The company's mailing address is 4755 44th Place, Phoenix, Arizona 85040. Prior to December 2018, the services at issue were provided in the context of contracts with Mercy Maricopa Integrated Care ("MMIC"). In 2018, MMIC became a part of Mercy Care as the result of a merger.

9.     Mercy Care, a health plan, offers "integrated care to children, adults and seniors eligible for AHCCCS benefits."[2] Its network of providers offers services and supports for a wide variety of care, including general health concerns, long term care, Medicare, and Medicaid. Mercy Care Regional Behavioral Health Authority ("RHBA") provides behavioral health services for Arizona residents. It makes behavioral health and integrated care services available to its members through a network of providers that deliver "prevention, intervention, treatment and rehabilitative services."[3]

10.     Historically, behavioral health services for AHCCCS members have been covered by the Arizona Department of Health Services/Division of Behavioral Health Services through contracts with RBHAs that subcontract with behavioral health service providers. As of October 1, 2018, a significant portion of behavioral health service delivery was moved from RBHAs to AHCCCS Complete Care ("ACC") plans. Mercy Care RBHA is responsible for overseeing the administration of behavioral health services through agencies such as Touchstone.

11.     Touchstone Behavioral Health dba Touchstone Health Services ("Touchstone") is an active Arizona domestic nonprofit corporation incorporated on April 10, 1969. Its principal address is 15648 North 35th Avenue, Phoenix, Arizona 85053. Under a contract with Mercy Care, Touchstone provides home, office, and community-based behavioral health services for Arizona children and families.[4]

/ / /

---

[2] https://www.mercycareaz.org. All referenced websites were last accessed on March 31, 2022.
[3] https://www.mercycareaz.org/become/join-rbha.
[4] https://www.touchstonehs.org/about/background.

- 4 -

1      12.     Southwest Network ("Southwest") is an active Arizona domestic nonprofit

2   corporation incorporated on September 1, 1999.  Its principal address is 2700 North

3   Central Avenue, Suite 1050, Phoenix, Arizona 85004.  Under a contract with Mercy

4   Care, Southwest "provides behavioral health services to infants, children, adolescents and

5   adults, partnering with them, their caregivers and families to help them overcome the

6   obstacles they face to live their best lives possible."[5]

7      13.     Spectrum Healthcare Group, Inc. ("Spectrum") is an active Arizona

8   domestic nonprofit corporation incorporated on October 13, 1965.  Its Registered Agent

9   is April Rhodes, and the company's principal address is 8 East Cottonwood Street,

10   Cottonwood, Arizona 86326.  Spectrum provides a broad range of healthcare services to

11   residents of Yavapai County.[6]  It, too, operates under a contract with Mercy Care.

12      14.     April Rhodes has been the CEO at Spectrum since September 2015.

13   According to her LinkedIn webpage,[7] Rhodes has a B.S. in Human Development and

14   Family Studies, a master's degree in Marriage and Family Counseling from Arizona State

15   University, and an M.B.A. from the University of Arizona.  As noted above, Rhodes is

16   the Registered Agent on file for Spectrum.

17      15.     At one point, Rhodes sought to form a Medical Service Organization

18   ("MSO") designed to provide resources and administrative support for medical practices.

19   As part of her preparation for operating her own MSO, Rhodes signed a management

20   services agreement with Touchstone and accepted the role of the company's Interim CEO

21   in December 2019.  Rhodes therefore acted as CEO for both Spectrum and, until April

22   2021, Touchstone, and she wielded her power with both companies to advance the

23   deferred revenue fraud scheme.  Rhodes sought to work out an agreement with Mercy

24   Care in which she would take over the financial and administrative duties for Southwest

25   Human Development, Inc.  Rhodes disclosed to Relator that as part of her MSO

26   _____

27   [5] http://www.southwestnetwork.org/ni/aboutus.shtml.
   [6] https://www.spectrumhealthcare-group.com.
28   [7] https://www.linkedin.com/in/april-rhodes-mba-lamft-b4592175.

1   consolidation plans, she was actively working to eliminate accrued deferred revenue
2   amounts on behalf of Southwest.

3          16.     Southwest Behavioral & Health Services ("SB&H") was established in
4   1969 as a federally funded program under a partnership known as St. Luke's – Jane
5   Wayland Community Mental Health Center.  Incorporated in 1974 as a 501(c)(3) non-
6   profit, SB&H employs just under 1,000 persons, including psychiatrists, psychologists,
7   therapists and other support staff who provide treatment to children and adults throughout
8   the Phoenix metropolitan area, rural Maricopa County, and Gila, Mohave, Coconino, and
9   Yavapai Counties.  SB&H provides outpatient mental health treatment and psychiatric
10  services, including medication monitoring; assistance for persons with addictions;
11  intensive inpatient care for persons in crisis; residential housing, in-home and supported
12  housing services; prevention services, community outreach and school-based counseling;
13  services throughout the lifespan for members with Autism Spectrum Disorder; and four
14  opioid replacement clinics.[8]

15  **III.    JURISDICTION AND VENUE**

16          17.     This Court has subject matter jurisdiction over the FCA claims alleged in
17  this complaint under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal
18  question and because the United States is a plaintiff.  This Court also has subject matter
19  jurisdiction under 31 U.S.C. § 3732(a).

20          18.     The Court may exercise personal jurisdiction over Defendants under 31
21  U.S.C. § 3732(a) because they can be found, reside, or transact business in this district
22  and because the claims arise out of or relate to Defendants' contacts with Arizona.

23          19.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28
24  U.S.C. § 1391(b) because Defendants can be found, reside, and transact business in this
25  district; an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a
26  substantial part of the events or omissions giving rise to the claims alleged in this

27

28  _____
    [8] https://www.sbhservices.org/history-mission-milestones.

complaint occurred in this district.

20.     Relator is aware of no subject matter or other jurisdictional bars set forth in the FCA that would apply to this action.

21.     Relator is aware of no statutorily relevant public disclosure of the allegations or transactions forming the core elements of the Counts against Defendants. Even if such a disclosure had occurred, Relator is the "original source" of the allegations in this complaint as that term is used in the FCA.  Relator acquired material, firsthand, and non-public knowledge of the information on which the allegations in this complaint are based, and Relator voluntarily and in good faith disclosed this information to the United States Attorney's Office for the District of Arizona before filing this complaint.

## IV.     THE FALSE CLAIMS ACT

22.     The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729, *et seq*.

23.     Relator alleges liability primarily under four of the FCA's seven liability provisions.

24.     First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability against a defendant who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

25.     Thus, liability under 31 U.S.C. § 3729(a)(1)(A) attaches when a defendant (a) made, or caused to be made, a claim (b) that was false or fraudulent (c) knowing of its falsity.

26.     Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability against a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

27.     Thus, liability under 31 U.S.C. § 3729(a)(1)(B) attaches when a defendant (a) made, used, or caused to be made or used, a record or statement that was (b) knowingly false and (c) material to a false or fraudulent claim.

28. Third, the FCA's "conversion" provision, 31 U.S.C. § 3729(a)(1)(D), imposes liability against a defendant who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property."

29. Thus, liability under 31 U.S.C. § 3729(a)(1)(D) attaches when a defendant (a) has or controls money or property (b) for government use and (c) with knowledge (d) delivers or causes the delivery of less than all of the money or property.

30. Fourth, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

31. Thus, liability under 31 U.S.C. § 3729(a)(1)(G) attaches when a defendant (a) acted knowingly and (b) made, used, or caused to be made or used (c) a false record or statement (d) that was material to an obligation (e) to pay or transmit money or property to the Government.

32. Liability under 31 U.S.C. § 3729(a)(1)(G) also attaches when a defendant (a) avoided or decreased an obligation (b) to pay or transmit money or property to the Government and, in so doing, (c) knowingly concealed such conduct or acted knowingly and improperly.

33. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government.  31 U.S.C. § 3729(b)(1)(A).

34. To plead and prove knowledge, no specific intent to defraud need be shown.  31 U.S.C. § 3729(b)(1)(B).

/ / /

35. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i).

36. A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

37. The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

38. This "natural tendency" test has long been the standard in the Ninth Circuit. *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008).

39. The Supreme Court reaffirmed the natural tendency test and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

40. In determining whether a false claim or statement is "capable of influencing" the Government's decision-making process, the FCA's materiality standard looks to the effect on the likely or actual behavior of a recipient of the misrepresentation and "depends on the particular facts of each case." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1019, 1021 (9th Cir. 2018).

41. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. 31 U.S.C. § 3730(b).

## V. OTHER RELEVANT STATUTES AND REGULATIONS

42. In 1965, Congress established the Grants to States for Medical Assistance Programs under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-2 ("Medicaid").

43.    Medicaid provides medical and health-related assistance for society's neediest and most vulnerable individuals, including pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of health care.  42 U.S.C. § 1396d.

44.    Medicaid is a joint federal-state health care program.  42 U.S.C. § 1396b.

45.    If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government.  42 U.S.C. § 1396a(a)(2).

46.    In order to receive federal funding, a participating state must comply with requirements imposed by the Act and accompanying regulations.

47.    Medicaid is administered at the federal level by the Secretary of HHS, an agency of the United States, through CMS, which promulgates regulations, including minimum coverage parameters.

48.    Each state has its own Medicaid agency, which is responsible for developing CMS-approved programs, setting its own guidelines regarding eligibility, services, and administering claims.

49.    The federal portion of Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average and ranges from approximately 50% to 75%.  42 U.S.C. § 1396d(b).

50.    In FCA actions, the practical effect of Medicaid's dual funding mechanism is that the FCA will recover the FMAP of each affected claim submitted in any state or territory.

51.    To qualify for these federal matching funds, each state Medicaid program must submit a plan to the Secretary of HHS for approval.  *See* 42 C.F.R. § 430, Subpart B, and § 488.303.

52.    Arizona participates in the Medicaid program, known as the Arizona Health Care Cost Containment System ("AHCCCS").

53.    "AHCCCS is a $14 billion program that operates under an integrated managed care model, through a Research and Demonstration 1115 Waiver.  Contracted

1  health plans coordinate and pay for physical and behavioral health care services delivered

2  by more than 80,0000 health care providers to 1.9 million Arizonans."[9]

3      54.    The federal government, through CMS, provides over 65% of the funds

4  used by AHCCCS to provide medical assistance to persons enrolled in the Medicaid

5  program, as shown in the following chart:

| FY | FMAP | Multiplier |
|------|----------|------------|
| 2022 | 76.21% | 3.20x |
| 2021 | 76.21% | 3.20x |
| 2020 | 76.22%[10] | 3.21x |
| 2019 | 69.81% | 2.31x |
| 2018 | 69.89% | 2.32x |
| 2017 | 69.24% | 2.25x |
| 2016 | 68.92% | 2.22x |
| 2015 | 68.46% | 2.17x |
| 2014 | 67.23% | 2.05x |
| 2013 | 65.68% | 1.91x |
| 2012 | 67.30% | 2.06x |

    55.    The federal government, through CMS, agrees to reimburse the State of

Arizona, through AHCCCS, in the amount of Arizona's FMAP proportion of the state

Medicaid expenditures.

    56.    The "reimbursement" actually takes the form of advance payments made

quarterly to Arizona consisting of the FMAP applied to Arizona's Form CMS 37

---

[9] https://www.azahcccs.gov/AHCCCS/AboutUs.

[10] FY 2020, FY 2021, and FY 2022 FMAPs reflect higher federal matching funding made available through the Families First Coronavirus Response Act (amended by the Coronavirus Aid, Relief, and Economic Security Act).  The additional funds are available to states from January 1, 2020, until the end of the public health emergency period for the COVID-19 pandemic.  This act provided a 6.2 percentage-point increase to all FMAP rates for all states (including the District of Columbia).

1  (Medicaid Program Budget Report) submitted for the quarter, which is an estimate of

2  allowable Medicaid expenditures for that quarter.  42 U.S.C. § 1396b(d)(1); 42 C.F.R. §

3  430.30(b).

4       57.    These quarterly advance payments have certain requirements and come

5  with conditions.  Mercy Care is required by statute and contract to return unspent revenue

6  at the end of the contract year or state fiscal year.  The AHCCCS Financial Reporting

7  Guide for RBHA Contractors, such as Mercy Care, states:

> The Contractor is expected to regularly determine from their
> providers whether there will be unspent funds by the end of
> the contract year or state fiscal year in the case of general
> funds and block grant funds.  *If general funds remain at the*
> *end of the fiscal year, providers are prohibited from*
> *recording deferred revenue; instead, these unspent general*
> *funds must be reported as a Payable to the Contractor and*
> *returned to the Contractor immediately for subsequent return*
> *to AHCCCS.*  Title XIX/XXI, Grant and County revenue may
> be deferred at the end of the provider's fiscal year only under
> extenuating circumstances.

16  AHCCCS Financial Reporting Guide for RBHA Contractors, Section 5.12, at 69

17  (emphasis added)

18       58.    In turn, Mercy Care's own Provider Financial Reporting Guide states that

19  unspent deferred revenue funds received by providers, such as Touchstone, (a) must be

20  reported as payable to Mercy Care and (b) must be returned after the completion of the

21  contract year for subsequent return to AHCCCS:

> Provider must report the amount of liabilities attributable
> directly to Mercy Care Programs and include the Funding
> Source and Program (if applicable).
>
> In regard to deferred revenue, *providers must clearly identify*
> *what amount of deferred revenue is attributable to Mercy*
> *Care.  Mercy Care deferred revenue should be further*
> *identified as prior contract year and/or current contract year.*
> *Any deferred revenue from a prior contract year should be*
> *reclassified on the Statement of Financial Position as a*

> *Payable to Mercy Care.  Any deferred revenue received during and remaining at the end of the current year should also be reclassified as a payable to Mercy Care in the 4th quarter statements and annual audit report.  Providers are not to spend any deferred revenue after the end of the contract year* (September 30) without Mercy Care's approval. Any request to do so should be directed to your organization's Network Relations Consultant.  If it is determined that there is a specific need for additional services in the following contract year, a meeting with Mercy Care's Chief Financial Officer and System of Care group will be scheduled to discuss programmatic specifics.

Mercy Care Provider Financial Reporting Guide (Mercy Care Complete Care and Mercy Care RBHA) at 16-17 (emphasis added).[11]

59.     These requirements flow down to sub-contracting entities.  Thus, the contract between Mercy Care and Touchstone (in paragraph 4.1.2 on page 10) memorializes the requirement to refund overpayments:

> In the event that Group [Touchstone] identifies any overpayments by Company [Mercy Care Plan], Group shall, as required under Section 6402(a) of the Patient Protection and Affordable Care Act, *report and return any and all such overpayments to Company within sixty (60) days of Group's identification of any and all such overpayments.*  In addition, when reporting and returning any such overpayments by Company, Group must provide Company with a written reason for the overpayment (e.g., excess payment under coordination of benefits, etc.).

60.     In return for receipt of federal subsidies, Arizona is required to administer its Medicaid program in conformity with a state plan that satisfies the requirements of the Act and accompanying regulations.  42 U.S.C. §§ 1396-1396w.

61.     Mercy Care and the Contractor Defendants caused, received, retained, and converted to their own use overpayments that occurred in the distribution of funds from

---

[11] https://www.mercycareaz.org/assets/pdf/acc-providers/ref-materials/Mercy%20Care%20RBHA%20Provider%20FRG_09132019.pdf.

1   CMS to AHCCCS to Mercy Care or Cenpatico and then to the Contractor Defendants.

2         62.     The Affordable Care Act ("ACA") contains a 60-day rule requiring any

3   "person" who has received an overpayment from Medicaid (or Medicare) "report and

4   return the overpayment to the Secretary, the State, an intermediary, a carrier, or

5   contractor, as appropriate" within 60 days after the latter of the date the overpayment was

6   identified or the date any corresponding cost report is due.  42 U.S.C. § 1320a-7k(d).

7         63.     The purpose of the rule is to ensure compliance with the statutes, promote

8   high quality care, and protect government funds against fraud and improper payments.

9   81 Fed. Reg. 7653.

10         64.     The seriousness of this legislative purpose is shown by the fact that the

11   FCA defines a failure to refund an overpayment as a violation of the reverse false claims

12   provision at 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C. § 1320a-7k(d)(3 (stating that any

13   overpayment constitutes an "obligation" for purposes of the FCA).

14         65.     Further guidelines related to this obligation are provided at 42 C.F.R. § 401,

15   which establishes the lookback period as six years from the date of receipt of the

16   overpayment, 42 C.F.R. § 401(f), and allows for suspension of the deadline for

17   repayment upon participation in a Voluntary Self-Referral Disclosure Protocol, 42 C.F.R.

18   § 401(b)(2).

19         66.     Mercy Care and the Contractor Defendants are covered under the rule

20   because "person" under the statute is defined as "an individual, a trust or estate, a

21   partnership, or a corporation."  42 U.S.C. § 301(a)(3).

22         67.     However, any failure of Mercy Care or the Contractor Defendants to refund

23   overpayments has an impact on AHCCCS and, ultimately, the federal government.  This

24   is because, at the end of each quarter, AHCCCS is required to provide CMS with a report

25   of actual expenditures for the quarter through submission of CMS Form 64 (Quarterly

26   Medicaid Statement of Expenditures).  42 C.F.R. § 430.30(c).  That form also requires

27   AHCCCS to report overpayments and underpayments.

28   / / /

68.     By statute, the next quarterly *disbursement* by CMS must then be "reduced or increased to the extent of any overpayment or underpayment which *the Secretary determines* was made under this section ... *for any prior quarter*." 42 U.S.C. § 1396b(d)(2)(A) (emphasis added); 42 C.F.R. § 430.30(d)(2).  In other words, CMS is obligated to reduce a quarterly disbursement by the amount of any overpayment AHCCCS made to a provider that has not been recovered.

69.     By statute, once AHCCCS has "discovered" or become aware of an overpayment, it has one year to recover or attempt to recover any overpayment before CMS makes such an adjustment on the quarterly federal disbursement to the state, subject to a few exceptions, such as if the overpaid entity is out of business. 42 U.S.C. § 1396b(d)(2)(C).  Once the year has passed, AHCCCS must report to CMS on the appropriate Form 64 any overpayment that has not been recouped, and that amount will be deducted from the next CMS disbursement.  The amount of adjustment is not the entire amount, but the proportion of the amount that represents federal monies.

## VI.     DEFENDANTS' FCA VIOLATIONS

### A.     Overview of Defendants' Fraud

70.     During his employment as Touchstone's COO, Relator obtained firsthand knowledge of Defendants' scheme through interaction with persons actually implementing the schemes, in particular Kathy Busby (current Touchstone board of directors member and board liaison), April Rhodes (former CEO of Touchstone), and Lance Monahan (former CFO of Touchstone).

71.     The illegal scheme implemented by Mercy Care and the Contractor Defendants consisted of retaining all or portions of overpayments instead of returning them to Mercy Care or Cenpatico.

72.     In turn, Mercy Care retained the overpayments or allowed them to be retained without reporting the overpayments to AHCCCS, thereby both causing AHCCCS to submit false statements to CMS through its Form 64s and depriving the federal government of monies owed.

- 15 -

73.     Because the Form 64s failed to disclose overpayments made by AHCCCS and retained by Mercy Care or a contractor defendant, no adjustment was made to the payment to AHCCCS, and the federal government was, in effect, deprived of funds that should have been refunded.

74.     Accordingly, Mercy Care knowingly submitted statements and claims for payment to AHCCCS that were false because they omitted any reference to the unspent deferred revenue funds owed to AHCCCS and because the scheme caused Mercy Care to retain or allow the Contractor Defendants to retain rather than remit overpaid funds to AHCCCS and CMS.

75.     The false statements or omissions by the Contractor Defendants and Mercy Care caused AHCCCS to unknowingly submit false statements to CMS that omitted any reference to the overpayments resulting in unspent deferred revenue.

76.     If AHCCCS's Form 64s had provided truthful information about the overpayments that were owed to the government, CMS would have adjusted subsequent disbursements to AHCCCS that would have had the effect of recouping the overpaid funds.

77.     Accordingly, the retention of those overpaid funds by Mercy Care and the Contractor Defendants deprived CMS of overpayments owed to it.

78.     The scheme was implemented by negotiations among Mercy Care and the Contractor Defendants resulting in agreements of various types to not properly reflect the deferred revenue and adjust their books to show all or a portion of those amounts as income rather than an obligation to refund the entity that paid the amount in the first place.

79.     While there were multiple motivations for this scheme, an important one was simply keeping the money rather than sending it back upstream. In some instances, these "adjust-offs" were used as negotiating chips. For example, an adjust-off was offered in exchange for removing an executive from a contractor that Mercy Care was unhappy with. Also important was looking good, that is, avoiding black marks for

1    overpaying on the one hand and underspending on the other.

2          **B.     Amounts Defendants Retained Rather than Refunded**

3          80.     Relator is aware of retained amounts of unspent and unrefunded deferred

4    revenue as follows:

| Entity Retaining Unspent Deferred Funds and Timeframe of Fund Receipts | Approximate Amount of Unspent Deferred Payments | Entity to which the Funds Are Immediately Owed | Upstream Entities to which the Funds Are Ultimately Owed |
|---|---|---|---|
| Touchstone Behavioral Services (prior to April 1, 2014 RBHA contract transition from Magellan to MMIC) | $300,000 (moved to income in about July 2017) | Mercy Care (originally owed to Magellan, then MMIC, and now Mercy Care) | AHCCCS, CMS |
| Touchstone Behavioral Services (FY 2016-2019) | $2.8 million (currently negotiating adjust-off leaving only $700,000 to pay) | Mercy Care | AHCCCS, CMS |
| Touchstone Behavioral Services | $240,000 | Cenpatico (Centene) | AHCCCS, CMS |
| Southwest Network (timeframe unknown) | $13 million; $9 million adjust-off; | Mercy Care | AHCCCS, CMS |

| | $4 million in remaining unspent funds | | |
|---|---|---|---|
| Spectrum (time frame unknown) | millions | Mercy Care | AHCCCS, CMS |
| SB&H (time frame unknown) | millions | Mercy Care | AHCCCS, CMS |

81.     Relator is also aware that an agency called La Frontera owed Mercy Care $2 million and the entities agreed to split the amount; that is, La Frontera refunded only $1 million to Mercy Care.

82.     Based on his interactions with entities and persons involved in the scheme, Relator alleges that these examples are only part of a much broader picture where illegal retention of overpayments is common, as are the kinds of negotiations he observed.

83.     This conduct violates the FCA, including the reverse false claims provision at 31 U.S.C. § 3729(a)(1)(G), discussed above, which prohibits a knowing and improper avoidance of an obligation to transmit money to the government.

84.     Under the FCA, the term "obligation" includes an "established duty" that arises "from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

85.     As articulated above, the "established duty" to repay unspent deferred payments is firmly embedded in the ACA's 60-day rule, discussed above. 42 U.S.C. § 1320a-7k(d).

86.     Mercy Care and the Contractor Defendants are all "persons" under the statute and are obligated to comply with the rule. 42 U.S.C. § 301(a)(3).

**C.     Defendants Knowingly Retained Monies Overpaid by the Government.**

87.     As Touchstone's COO and Chief Compliance and Ethics Officer, Relator's knowledge is based on his personal experience. His job responsibilities made him aware of and integrally involved in Touchstone's management at a high level.

/ / /

88.     Because of his position, he also participated in communications and meetings with other providers who serviced Mercy Care members as well as with Mercy Care high-level administrators.

89.     Relator first became aware of Defendants' scheme and violations in 2017 at a meeting with Donn Merrill and Bryan Davey (former CFO and CEO of Touchstone). They were reviewing revisions Merrill had made to a monthly profit and loss statement, and Davey jokingly said something to the effect that Merrill found $300,000 just sitting around.  In fact, $300,000 was added to revenue in that statement.  Relator was aware that Touchstone had been carrying a deferred payment amount of $300,000 from FY 2015 that it originally owed to Magellan and then to MMIC.

90.     Relator concluded that the "found" income could only have come from a favorable adjustment of that $300,000 in deferred revenue.  In fact, the $300,000 amount owed disappeared from Touchstone's books.  Relator believes the transfer of that $300,000 occurred in July 2017.  This was sometime after Merrill learned that some other agencies had not received any notices of money owed from MMIC and Touchstone's own auditor from Eide Bailey told him that some agencies had received formal letters when they owed money—the implication being that no news means the amount owed is not being tracked.  Merrill likely felt he could turn the deferred revenue into income without that inappropriate transaction being noticed.

91.     In late 2019, Relator became aware of additional violations by Touchstone when he attended a meeting on December 10 between Mercy Care executives and leadership staff from Touchstone, including Touchstone's chief financial officer, Lance Monahan, and Sherman Moore, Mercy Care's finance director.  During the meeting, Moore reported that Touchstone had recorded $2.8 million in deferred revenue funds that the company accrued throughout prior fiscal years.  Relator was immediately concerned that Touchstone had accrued such a large amount of deferred revenue because he knew the company was legally and contractually required to pay those funds back to Mercy Care, and Mercy Care was in turn legally required to reimburse those monies back to

1    AHCCCS.  In addition, AHCCCS was obligated to return unused funds to the federal

2    government.

3         92.    Since that meeting, Relator has made continuous efforts to resolve the

4    deferred revenue issue, in terms of establishing the actual amount owed by Touchstone

5    and then taking the appropriate steps to return it to Mercy Care.  His efforts included

6    numerous direct discussions with Touchstone executives Monahan and Rhodes.

7         93.    However, neither Monahan nor Rhodes provided him an adequate rationale

8    for keeping such a large sum of deferred revenue in Touchstone's financials or a

9    persuasive justification for Touchstone's failure to reimburse overdue funds to Mercy

10   Care.  To the contrary, Monahan admitted that he had routinely sidestepped reimbursing

11   deferred revenue funds to MMIC (which has now merged with Mercy Care) when he

12   worked from 2006 to 2010 at another provider, Terros Health.

13        94.    In December 2019, Rhodes became Touchstone's CEO, and she began

14   actively working to consolidate the company with an MSO she was developing.  On

15   December 16, 2019, Relator and Rhodes participated in an introductory meeting at

16   Touchstone.  During their meeting, Relator told Rhodes that Touchstone had realized an

17   overpayment of unspent deferred revenue funds, delivered from AHCCCS, in the amount

18   of $2.8 million.  He then advised her that the payback of those funds, in accordance with

19   Touchstone's contract with Mercy Care, needed to be addressed

20        95.    Rhodes responded by directing Relator not to take any action regarding the

21   reporting and reimbursement of Touchstone's accrued deferred revenue.  She told Relator

22   that she is personal friends with Lorry Bottrill, the President and CEO of Mercy Care,

23   and that she planned to speak with Bottrill to have some, or all, of Touchstone's accrued

24   deferred revenue "adjusted off" the company's financials.  Rhodes further told Relator

25   that she knew of other providers, including Spectrum and Southwest, that have made

26   similar arrangements to "adjust off" accrued deferred revenue amounts owed to Mercy

27   Care.

28   / / /

96.     Relator was surprised to hear about this plan to simply "adjust off" Touchstone's deferred revenue from the company's financials as he understood such an action to violate the Financial Reporting Guide for RBHA Contractors which, as discussed above, prohibits recording deferred revenue and requires Touchstone to return the funds to Mercy Care immediately, or at the latest within ten days after the end of a contract year, for subsequent return to AHCCCS.

97.     On January 28, 2020, Rhodes told Relator that she met with Bottrill the previous day at which time Bottrill verbally agreed to "adjust Touchstone's overpayment off." At that time, Rhodes indicated that the amount of accrued deferred revenue Touchstone owed to Mercy Care was $2.8 million.

98.     On February 5, 2020, Mercy Care's finance department e-mailed Touchstone's Fiscal Year 2019 Deferred Revenue Analysis Report to the agency. The e-mail states that Touchstone would receive with the monthly report a summary of estimated deferred revenue that may be due to Mercy Care.

99.     In addition, the 2019 Deferred Revenue Analysis Report indicates that (1) Touchstone's deferred revenue amount for FY 2019 (October 1, 2018 through September 30, 2019) was $1,759,768; and (2) Mercy Care and Touchstone have actual knowledge of its obligation to return deferred revenue:

Provider:  TOUCHSTONE BEHAVIORAL HEALTH
Tax Number: 860223116

The Arizona Department of Behavioral Services requires that all revenue be encountered for appropriate, authorized Title 19 or Non-Title 19 expenditures or returned to Mercy Care of Arizona. Below is the most current revenue and encounter data for your organization for T-19 Contract Year spanning from (October-September) and NT Contract Year spanning from (July-June).

*Performance Summary:*

**TOUCHSTONE BEHAVIORAL HEALTH  TIN: 860223116**

|  | TXIX-ADULT | TXIX-CHILD | NON-TITLE |
|---|---|---|---|
| Total Encounterable Funding: | 565 | 6,937,427 | 12,000 |
| Total Adjudicated Encounters: | 26,531 | 5,177,659 | 12,804 |
| Encounter Value % | 4697.70% | 74.63% | 106.70% |
| *Estimated Deferred Amt:* | $0 | $1,759,768 | $0 |



mercy care

- 21 -

100.   Also on February 5, 2020, Relator participated in a meeting at Mercy Care that Rhodes and Christi Lundeen, the Chief Innovation Officer at Mercy Care, both attended.  At the end of the meeting, Lundeen asked Rhodes to stay behind and speak with her one-on-one.  The next day, Relator asked Rhodes whether there was anything she and Lundeen directly discussed that he should be made aware of.  Rhodes disclosed to Relator that she and Lundeen finalized an agreement to adjust $9 million of Southwest's $13 million in accrued deferred revenue off the company's financials.  Rhodes explained that, based on her conversation with Lundeen, the MSO she was forming would take over Southwest's financial and administrative duties in the near future.  Rhodes then advised Relator that she envisioned him in a leadership role at Southwest and potentially other agencies that consolidate with her up-and-coming MSO.

101.   Relator attended several meetings that constitute strong and concrete evidence of the existence of the deferred payments being carried by Touchstone and other agencies, Touchstone's and Rhodes' knowledge that Touchstone owed deferred payments of about $2.8 million to Mercy Care, Touchstone's efforts to avoid refunding the payments by negotiating with Bottrill an adjust-off or complete forgiveness that deprives ACCCHS and the federal government of refunds to which they are entitled, and discussions of how to document the transaction to prevent detection.

102.   One such meeting occurred on February 20, 2020, when Relator met with Monahan and Rhodes to discuss Touchstone's accrued deferred revenue.  Among other things, Monahan claimed that Mercy Care did not want the money back because it was a "black mark" with respect to managing government funds.  Rhodes stated that Bottrill said "she would work with us."  Rhodes nonetheless did not put anything about the negotiations into a board presentation, saying "Let's not put that in writing in places …icht where, like if somebody printed this and took it somewhere, or, I mean you just never know."

103.   In the course of the discussions, Relator learned in addition that Touchstone owed $240,000 in deferred revenue to Cenpatico.  Although Rhodes said she would

discuss the issue with Cenpatico, Relator heard nothing further on the issue.

104.    Other interactions Relator had on this issue indicate that Rhodes and Mercy Care agreed on the contours of an "adjust off" that will deprive CMS of $1.9 million of the $2.8 million outstanding deferred payments owed.  For example, in October 2020, Relator raised the overpayment issue with Rhodes in the course of preparation for an annual board retreat.  Rhodes had made a request to Mercy Care to waive the deferred payments owed to it.  There was also an ongoing discussion that Mercy Care owed Touchstone about $1 million in claims paid at a rate below the contracted rate about certain underpayments owed to Touchstone.  Rhodes told Relator she had received an e-mail from Tad Gary, the COO at Mercy Care, who said that he was waiting to hear how the Touchstone claims underpayment dispute is resolved before agreeing to any settlement terms related to overpayments.

105.    On November 11, 2020, Relator participated in a meeting with Rhodes, Monahan, and Mercy Care COO Gary, among others.  During the meeting, the participants addressed the underpayment dispute, which required additional analysis before the amount would be agreed to.  Mercy Care also proposed a resolution of the overpayment issue.  Mercy Care's proposal assumed an overpayment amount of $1.7 million.  Mercy Care first offered to forgive $800,000, characterizing the amount as "an encounter credit."  Then, with respect to the remaining $900,000, Mercy Care agreed to factor in amounts related to Mercy Care's underpayments to Touchstone.  Mercy Care's position was that Touchstone ultimately would still have an overpayment amount of $700,000 and offered to amortize repayment of $350,000 in the next 12 months and to apply the remaining $350,000 against future encounters.

106.    On November 13, 2020, Relator had a follow-up conversation with Rhodes and Monahan.  Rhodes and Monahan determined, among other things, that Touchstone would not raise the issue of $1.1 million in overpayment received in FY 2016 and 2017; Monahan commented that he viewed Mercy Care's approach as an "under the table pass" on recouping the earlier amount.  Rhodes and Monahan further commented that the

- 23 -

1   language of any agreement should be clear that it resolves all overpayment amounts,

2   thereby wiping out the prior $1.1 million amount owed.  The steps remaining with respect

3   to overpayments were that Mercy Care would provide a written settlement proposal and

4   the two entities would resolve their underpayment dispute, which would be a set-off for

5   the amount owed.

6       107.   At a Touchstone board meeting on December 2, 2020, Rhodes addressed

7   the deferred payment issue.  She emphasized that Touchstone would not dispute the

8   amount of deferred payment owed as $1.7 million, even though Touchstone's books

9   recorded the amount due as $2.8 million.  Rhodes also said that Touchstone would seek a

10   full release, thereby eliminating Mercy Care's ability to recoup the additional $1.1

11   million of deferred payment on Touchstone's books.  The intent not to raise the

12   additional $1.1 million with Mercy Care was reiterated at a January 27, 2021 Touchstone

13   board of directors meeting in which Monahan recounted the numbers and touted with

14   respect to Mercy Care's amount of $1.8 million that Mercy Care "can believe that."

15       108.   On February 3, 2021, a meeting occurred between Touchstone and Mercy

16   Care in which Mercy Care offered a settlement that would reduce the amount owed to

17   $900,000 because it wanted the issue resolved and because Touchstone was a "good

18   partner."  Asked whether this payment would take care of everything owed through 2020,

19   Mercy Care responded that it would satisfy amounts owed through FY 2019.  In that way,

20   Touchstone buried the $1.1 million of deferred payment it knew it owed to Mercy Care.

21   Further noting that it had received AHCCCS guidance allowing delay of collection on

22   deferred payments, Mercy Care noted that it did not need to collect the deferred payment

23   now, but that it would be expected to do so at some point.  Rhodes indicated she thought

24   this was a reasonable settlement offer but would need to get board approval.

25       109.   In a board meeting on December 3, 2021, Touchstone's current CEO, Eddy

26   Broadway, apprised the board that Touchstone had encountered an increasing amount of

27   deferred revenue, as recorded in the October 2021 financials.  Broadway incorrectly

28   stated the amount of deferred revenue as $435,000, and Relator later corrected the

1  amount as $472,000.

2      110.   Broadway reviewed possible solutions to address the deferred revenue with

3  the board, which included "there's kind of the Terros way of sitting on it, hiding it, and

4  don't, not showing anything until you're asked or the Jeff Jordy way which is let me

5  write you a check as soon as I can."  Board member Kathy Busby responded that "I kind

6  of like Terros," which resulted in laughter and agreement amongst the board members.

7  After some discussion, Busby instructed Broadway: "I say stick our heads in the sand

8  until they come for it and drag it on and drag it on and see if we can't cut some other

9  deal."  Broadway responded: "it's not a bad idea, it's worked before."  Busby responded

10  that "Donn did it," referring to Donn's former role with Touchstone as CFO.  Donn

11  admittingly stated: "I've done it with the best of them."

12      111.   At a board meeting on February 23, 2022, an auditor apprised the board of

13  newly accumulated deferred revenue of $440,000.

14      112.   On February 24, 2022, Relator met via Zoom with Touchstone's Controller,

15  Craig Sheen, and a consultant Touchstone hired.  Sheen stated that when he was formerly

16  employed at SB&H, the CFO and CEO would "always" negotiate deferred revenue with

17  Mercy Care.  Sheen stated the amounts SB&H's CFO and CEO would adjust off were "in

18  the millions."

19      113.   At that same meeting, Sheen also recounted a conversation Broadway told

20  him about regarding SB&H's former CEO refusing to pay back deferred revenue.

21      114.   Mercy Care is well acquainted with its obligation to return unspent revenue

22  at the end of the contract year or state fiscal year.  As previously noted at paragraphs 57-

23  59, not only is it a statutory obligation, but it is also set forth in the AHCCCS Financial

24  Reporting Guide for RBHA Contractors such as Mercy Care.  There is no ambiguity in

25  the requirement: "If general funds remain at the end of the fiscal year, providers are

26  prohibited from recording deferred revenue; instead, these unspent general funds must

27  be reported as a Payable to the Contractor and returned to the Contractor immediately

28  for subsequent return to AHCCCS."  AHCCCS Financial Reporting Guide for RBHA

1  Contractors, Section 5.12, at 69.

2    115.   In turn, and as previously cited at paragraph 59, Mercy Care included in its

3  own Provider Financial Reporting Guide—and therefore had actual knowledge of—the

4  requirement that unspent deferred revenue funds received by providers, such as

5  Touchstone, must be reported as payable to Mercy Care and must be returned after the

6  completion of the contract year for subsequent return to AHCCCS.

7    116.   The contract between Mercy Care and Touchstone also contains evidence

8  that Defendants acted with actual knowledge.  That contract (in paragraph 4.1.2 on page

9  10) expressly memorializes the requirement to refund overpayments: "In the event that

10  Group [Touchstone] identifies any overpayments by Company [Mercy Care Plan], Group

11  shall, … report and return any and all such overpayments to Company within sixty (60)

12  days of Group's identification of any and all such overpayments."

13    117.   Given this documentation and the other circumstances outlined above,

14  Mercy Care and the Contractor Defendants had actual knowledge of their obligations to

15  timely report and refund overpayments and of their failure to do so.

16    118.   In sum, through the various communications and negotiations regarding

17  how to handle deferred payments owed to Touchstone, Relator uncovered the following

18  wrongful conduct:

19    a.   Touchstone knowingly retained deferred payments owed to Mercy

20  Care for FY 2016 through FY 2019 in the amount of $2.8 million; persons involved are

21  Rhodes and Monahan.

22    b.   Rather than refund the deferred payments to Mercy Care,

23  Touchstone and Mercy Care have negotiated an "adjust-off" of two-thirds of the $2.8

24  million owed; persons involved are Rhodes, Monahan, Bottrill, and Moore.

25    c.   Southwest is knowingly retaining deferred payments owed to Mercy

26  Care in the amount of $13 million; persons involved are Rhodes and Lundeen.

27    d.   Rather than refund the deferred payments to Mercy Care, Southwest

28  and Mercy Care are knowingly negotiating an "adjust-off" of some or all of the $13

- 26 -

1  million owed, likely $9 million.

2        e.    Touchstone owes Cenpatico at least $240,000 in overpayments.

3        f.    Touchstone owed MMIC, and now (post-merger) owes Mercy Care,

4  at least $300,000 in overpayments.

5        g.    Spectrum has made arrangements to "adjust off" accrued deferred

6  revenue amounts owed to Mercy Care, in the millions of dollars, rather than refund the

7  deferred payments.

8        h.    SB&H has made arrangements to "adjust off" accrued deferred

9  revenue amounts owed to Mercy Care, in the millions of dollars, rather than refund the

10  deferred payments.

11        i.    Mercy Care has created a culture of negotiating and failing to collect

12  overpayments rather than fully reporting and returning overpayments, leading to a

13  conclusion that far more amounts are also owed to AHCCCS and CMS.

14        j.    Defendants continue to engage in the scheme (and retain earlier

15  payments), even joking and making light of their fraud, which results in ongoing

16  financial damage to the Government.

17  **VII.    CAUSES OF ACTION**

18        **COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A)**

19        **(FCA: Presentation of False Claims)**

20      119.    Relator re-alleges the allegations set forth in paragraphs 1 through 118, as if

21  fully set forth herein.

22      120.    This a claim for treble damages, statutory penalties, and other relief under

23  the FCA.

24      121.    Through the acts described above and otherwise, Defendants, by and

25  through their agents and employees, in reckless disregard or deliberate ignorance of the

26  truth or falsity of the information involved, or with actual knowledge of the falsity of the

27  information, knowingly presented or caused to be presented to the United States

28  materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. §

- 27 -

1  3729(a)(1)(A).

2       122.   Each of the false or fraudulent claims Defendants submitted, or caused to

3  be submitted, is a separate violation of 31 U.S.C. § 3729(a)(1)(A), which supports the

4  imposition of statutory penalties for each violation.

5       123.   In addition, the United States was unaware of the false or fraudulent nature

6  of the claims Defendants submitted or caused to be submitted.

7       124.   The false or fraudulent claims Defendants knowingly submitted or caused

8  to be submitted to the United States were material to the United States' decisions and

9  legal authorization to make payments to Defendants.

10       125.   Had the United States actually known of the false or fraudulent nature of

11  the claims, it would have been prohibited by law from making corresponding payments.

12       126.   Because of these false or fraudulent claims Defendants submitted or caused

13  to be submitted, the United States has been damaged in an amount to be determined at

14  trial, which amount is statutorily required to be trebled.

15             **COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)**

16         **(FCA: Using False Statements Material to False Claims Paid)**

17       127.   Relator re-alleges the allegations set forth in paragraphs 1 through 118, as if

18  fully set forth herein.

19       128.   This a claim for treble damages, statutory penalties, and other relief under

20  the FCA.

21       129.   Through the acts described above and otherwise, Defendants, by and

22  through their agents and employees, in reckless disregard or deliberate ignorance of the

23  truth or falsity of the information involved, or with actual knowledge of the falsity of the

24  information, knowingly made, used, or caused to be made or used false records or

25  statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C.

26  § 3729(a)(1)(B).

27       130.   Defendants' false certifications and representations were made for the

28  purpose of ensuring that the United States paid the false or fraudulent claims, which was

- 28 -

1    a reasonable and foreseeable consequence of Defendants' statements and actions.

2       131.    The United States was unaware of the falsity of the records, statements, and

3    claims Defendants made or submitted and, because of the falsity of these records or

4    statements, authorized payments to be made, made such payments, and has been

5    damaged.

6       132.    The false records or statements Defendants knowingly made to the United

7    States were material to the United States' decisions to make payments to Defendants.

8       133.    Had the United States actually known of the false or fraudulent nature of

9    Defendants' representations and claims, it would have been prohibited by law from

10   making corresponding payments.

11      134.    Because of these false records or statements, the United States paid claims,

12   resulting in damages to the United States in an amount to be determined at trial.

13   **COUNT III – Violation of 31 U.S.C. § 3729(a)(1)(D)**

14   **(FCA: Conversion of Government Funds)**

15      135.    Relator re-alleges the allegations set forth in paragraphs 1 through 118, as if

16   fully set forth herein.

17      136.    Through the acts described above and otherwise, Defendants knowingly

18   kept possession, custody, or control of property or money used, or to be used, by the

19   Government and knowingly delivered, or caused to be delivered, less than all of that

20   money or property, in violation of 31 U.S.C. § 3729(a)(1)(D).

21      137.    The United States, unaware of Defendants' possession, custody, or control

22   of property or money used, or to be used, by the Government and unaware of

23   Defendants' knowing delivery of, or causing to be delivered, less than all of that money

24   or property, has been deprived of money or property that it otherwise would have

25   received.

26      138.    By reason of Defendants' violations of the FCA, the United States has

27   suffered and may continue to suffer economic loss.

28   / / /

**COUNT IV – Violation of 31 U.S.C. § 3729(a)(1)(G)**

**(FCA: Avoiding or Decreasing an Obligation to Pay)**

139.    Relator re-alleges the allegations set forth in paragraphs 1 through 118, as if fully set forth herein.

140.    This a claim for damages and other relief under the FCA.

141.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

142.    An "obligation" includes "an established duty, whether or not fixed, arising from an express or implied contractual ... relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment," 31 U.S.C. § 3729(b)(3), including, but not limited to, "any overpayment [from Medicare] retained by a person after the deadline for reporting and returning an overpayment."  79 Fed. Reg. 29,843, 29,918 (May 23, 2014).

143.    An "overpayment" is defined as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled."  42 U.S.C. § 1320a–7k(d)(4)(B).

144.    A person or entity that receives an overpayment of Medicare or Medicaid funds must report and return the overpayment within 60 days of the date on which the overpayment was identified.  42 U.S.C. § 1320a–7k(d)(1)–(2).

145.    The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted.

146.    Defendants knowingly made false and fraudulent representations and claims to the United States that were material and deprived the United States of money Defendants were obligated to repay to the United States.

147.   By knowing they had received and retained deferred revenue to which they were not entitled, yet failing to self-disclose the misconduct to the United States or to refund the deferred revenue, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Relator, on his own behalf and on behalf and in the name of the United States, requests that the Court:

    i.   Enter judgment for the United States and Relator and against Defendants;

    ii.   Order Defendants to cease and desist from violating the FCA;

    iii.   Award the United States Government, through a money judgment against Defendants, the full amount of damages the United States sustained because of Defendants' actions, plus all other relief provided by 31 U.S.C. § 3729(a), including, without limitation, statutory penalties and treble damages;

    iv.   Award Relator the maximum relator's share available under the FCA, for bringing this action, namely, 25 percent of the proceeds of the action by judgment or settlement of the claim if the Government intervenes in the matter (or pursues its claim through any alternate remedy available to the Government as per 31 U.S.C. § 3730(c)(5)) or, alternatively, 30 percent of the proceeds of the action by judgment or settlement of the claim, if the Government declines to intervene, as provided in 31 U.S.C. § 3730(d);

    v.   Award Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by the FCA;

    vi.   Award interest on money judgments, as provided by law; and

    vii.   Grant such other relief for the United States and Relator as the Court deems just, necessary, and proper.

1  **IX.     REQUEST FOR TRIAL BY JURY**

2          Pursuant to Federal Rule of Civil Procedure 38, Relator hereby requests a trial by

3  jury.

4          Dated: March 31, 2022                    HALUNEN LAW

5

6                                                   Lon R. Leavitt

7                                                   Arizona Bar No. 35825

8                                                   One Renaissance Tower
                                                    Two North Central Avenue, Suite 1800

9                                                   Phoenix, Arizona 85004
                                                    Telephone: (602) 254-6494

10                                                  Fax: (612) 605-4099

11                                                  leavitt@halunenlaw.com

12
                                                    Susan M. Coler*

13                                                  80 South 8th Street, Suite 1650
                                                    Minneapolis, Minnesota 55402

14                                                  Telephone: (612) 605-4098

15                                                  Fax: (612) 605-4099
                                                    coler@halunenlaw.com

16                                                  (* *pro hac vice* application forthcoming)

17
                                                    *Attorneys for Plaintiff/Relator Craig Thomas*

18

19

20

21

22

23

24

25

26

27

28