Susan M. Coler*
HALUNEN LAW
80 South 8th Street, Suite 1650
Minneapolis, Minnesota 55402
Telephone: (612) 605-4098
Fax: (612) 605-4099
coler@halunenlaw.com
(* admitted *pro hac vice*)

Leonard Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Fax: (602)840-3012
leonard@hbsslaw.com

*Attorneys for Plaintiff/Relator Craig Thomas*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America *ex rel.* Craig Thomas,<br><br>Plaintiff/Relator,<br><br>v.<br><br>Mercy Care, and Touchstone Behavioral Health dba Touchstone Health Services,<br><br>Defendants. | Case No.: 2:22-cv-00512-JAT<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.***<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Defendants, providers of health services to Arizona residents, have violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, by failing to refund hundreds of thousands of dollars in Medicaid overpayments and, instead, converting those overpayments to their own benefit. In so doing, they have deprived Arizona's Medicaid

Program, the Arizona Health Care Cost Containment System ("AHCCCS") and ultimately the federal government, through the Centers for Medicare and Medicaid Services ("CMS"), of funds that rightly belong to the United States.

Defendants are Mercy Care, including Mercy Care RBHA, which has a direct contract with AHCCCS and Touchstone Behavioral Health dba Touchstone Health Services ("Touchstone"), a non-profit corporation that contracts with Mercy Care to provide services. Defendants conspired and engaged in a scheme to avoid reimbursing overpayments, sometimes characterized as deferred revenue[1] to AHCCCS and CMS in violation of (a) federal law, including CMS regulations; (b) AHCCCS's Financial Reporting Guide for RBHA Contractors; (c) Mercy Care's Provider Financial Reporting Guide; and (d) individual contractual obligations.

The false claims and false statements Defendants submitted as part of this agreed-to scheme, together with the government funds they failed to repay and, instead, converted to their own benefit, form the basis of this action, which *qui tam* plaintiff and relator Craig Thomas ("Relator") brings pursuant to the FCA on his own behalf and on behalf of the United States of America. Specifically, Relator brings this action against Defendants for treble damages, statutory penalties, and other relief arising from Defendants' false, fraudulent, and improper claims and conduct. The causes of action asserted in this complaint are based on the facts and information set forth below.

---

[1] Relator uses the terms overpayment and deferred revenue interchangeably. As used here, the receipt of an overpayment results in deferred revenue, that is unearned money.

## I.    NATURE OF THE ACTION

1.    This case is about how Defendants treated overpayments that occurred in the distribution of funds from CMS to AHCCCS to Mercy Care and then to Touchstone. Relator alleges Defendants violated the FCA and converted to their own benefit federal funds to which they were not entitled.

2.    Relator has personal, substantial, firsthand knowledge of Defendants' scheme.

3.    Relator is not aware that Defendants truthfully reported, refunded, or otherwise corrected the overpayments they received.

4.    Relator reported this misconduct to his employer, Touchstone, but the company ignored those concerns and continued with its fraudulent conduct.

5.    As discussed below, Relator seeks recovery for Defendants' FCA violations from March 31, 2012, through the present.

## II.    PARTIES

### A.    Relator

6.    Relator Craig Thomas is a resident of Arizona and was the Chief Operating Officer of Touchstone Behavioral Health dba Touchstone Health Services,[2] a position he held from December 2016 through June 1, 2022.  Relator is a well-respected healthcare executive who earned a B.S. in Psychology from Missouri State University and an M.B.A. from Keller Graduate School of Management.  He is a Certified Healthcare Compliance

---

[2] References to "Touchstone" include Touchstone Behavioral Health and Touchstone Health Services.

Professional and a Certified Healthcare Privacy Compliance Professional through the Health Care Compliance Association. Relator is also a Certified Professional Coder through the American Academy of Professional Coders. Relator has a strong background in compliance and auditing.

7.    Relator brings this matter on behalf of the United States under the FCA. The United States acts through its various agencies and departments, including the Department of Health and Human Services ("HHS") and CMS.

**B.    Defendants**

8.    Mercy Care is an active Arizona domestic nonprofit corporation incorporated on November 26, 1985. The company's mailing address is 4755 44th Place, Phoenix, Arizona 85040. Prior to December 2018, the services at issue were provided in the context of contracts with Mercy Maricopa Integrated Care ("MMIC"). In 2018, MMIC became a part of Mercy Care as the result of a merger.

9.    Mercy Care, a health plan, offers "integrated care to children, adults and seniors eligible for AHCCCS benefits."[3] Its network of providers offers services and supports for a wide variety of care, including general health concerns, long term care, Medicare, and Medicaid. Mercy Care Regional Behavioral Health Authority ("RBHA") provides behavioral health services for Arizona residents. It makes behavioral health and integrated care services available to its members through a network of providers that

---

[3] https://www.mercycareaz.org. All referenced websites were last accessed on January 10, 2023.

deliver "prevention, intervention, treatment and rehabilitative services."[4]

10.    Historically, behavioral health services for AHCCCS members have been covered by the Arizona Department of Health Services/Division of Behavioral Health Services through contracts with RBHAs that subcontract with behavioral health service providers.  As of October 1, 2018, a significant portion of behavioral health service delivery was moved from RBHAs to AHCCCS Complete Care ("ACC") plans.  Mercy Care RBHA is responsible for overseeing the administration of behavioral health services through agencies such as Touchstone.

11.    Touchstone Behavioral Health dba Touchstone Health Services ("Touchstone") is an active Arizona domestic nonprofit corporation incorporated on April 10, 1969.  Its principal address is 15648 North 35th Avenue, Phoenix, Arizona 85053.  As a provider/sub-contractor for Mercy Care, Touchstone has contracted to provides home and community-based behavioral health services for Arizona children and families.[5]

## III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and because the United States is a plaintiff.  This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

13.    The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because they can be found, reside, or transact business in this district and

---

[4] https://www.mercycareaz.org/become/join-rbha.
[5] https://www.touchstonehs.org/about/background.

- 5 -

because the claims arise out of or relate to Defendants' contacts with Arizona.

14.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants can be found, reside, and transact business in this district; an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

15.    Relator is aware of no subject matter or other jurisdictional bars set forth in the FCA that would apply to this action.

16.    Relator is aware of no statutorily relevant public disclosure of the allegations or transactions forming the core elements of the Counts against Defendants.  Even if such a disclosure had occurred, Relator is the "original source" of the allegations in this complaint as that term is used in the FCA.  Relator acquired material, firsthand, and non-public knowledge of the information on which the allegations in this complaint are based, and Relator voluntarily and in good faith disclosed this information to the United States Attorney's Office for the District of Arizona before filing this complaint.

## IV.    THE FALSE CLAIMS ACT

17.    The FCA makes it unlawful for any person to cause the submission, directly or indirectly, of false or fraudulent claims for payment to the Government.  *See* 31 U.S.C. §§ 3729, *et seq*.

18.    Relator alleges liability primarily under five of the FCA's seven liability provisions.

19.    First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A),

- 6 -

imposes liability against a defendant who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

20. Thus, liability under 31 U.S.C. § 3729(a)(1)(A) attaches when a defendant (a) made, or caused to be made, a claim (b) that was false or fraudulent (c) knowing of its falsity.

21. Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability against a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

22. Thus, liability under 31 U.S.C. § 3729(a)(1)(B) attaches when a defendant (a) made, used, or caused to be made or used, a record or statement that was (b) knowingly false and (c) material to a false or fraudulent claim.

23. Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C) imposes liability against a defendant who conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

24. Thus, liability under 31 U.S.C. § 3729(a)(1)(C) attaches when a defendant (a) conspires with one or more persons to get the United States to violate any of the subparagraphs (A), (B), (D), (E), (F), or (G), (b) and one or more conspirators performed any act in furtherance of that violation, (c) resulting in damages to the United States.

25. Fourth, the FCA's "conversion" provision, 31 U.S.C. § 3729(a)(1)(D), imposes liability against a defendant who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be

- 7 -

delivered, less than all of that money or property."

26. Thus, liability under 31 U.S.C. § 3729(a)(1)(D) attaches when a defendant (a) has or controls money or property (b) for government use and (c) with knowledge (d) delivers or causes the delivery of less than all of the money or property.

27. Fifth, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

28. Thus, liability under 31 U.S.C. § 3729(a)(1)(G) attaches when a defendant (a) acted knowingly and (b) made, used, or caused to be made or used (c) a false record or statement (d) that was material to an obligation (e) to pay or transmit money or property to the Government.

29. Liability under 31 U.S.C. § 3729(a)(1)(G) also attaches when a defendant (a) avoided or decreased an obligation (b) to pay or transmit money or property to the Government and, in so doing, (c) knowingly concealed such conduct or acted knowingly and improperly.

30. The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government.  31 U.S.C. § 3729(b)(1)(A).

31. To plead and prove knowledge, no specific intent to defraud need be shown.

- 8 -

31 U.S.C. § 3729(b)(1)(B).

32. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States.  31 U.S.C. § 3729(b)(2)(A)(i).

33. A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded.  31 U.S.C. § 3729(b)(2)(A)(ii).

34. The term "obligation," as it applies to the reverse false claim provision of the FCA at 31 U.S.C. § 3729(a)(1)(G), means "an established duty, whether or not fixed, arising from . . . the retention of any overpayment."

35. The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

36. This "natural tendency" test has long been the standard in the Ninth Circuit. *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008).

37. The Supreme Court reaffirmed the natural tendency test and described a holistic approach to analyzing it.  *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

38. In determining whether a false claim or statement is "capable of influencing" the Government's decision-making process, the FCA's materiality standard looks to the

effect on the likely or actual behavior of a recipient of the misrepresentation and "depends on the particular facts of each case." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1019, 1021 (9th Cir. 2018).

39.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government or other violation of the FCA to sue on behalf of the Government and to share in any recovery.  31 U.S.C. § 3730(b).

**V.    STATUTES AND REGULATIONS PERTINENT TO RECEIPT OF FEDERAL MONIES UNDER TITLE XIX/MEDICAID AND TREATMENT OF OVERPAYMENTS**

**A**.    **General**

40.    In 1965, Congress established the Grants to States for Medical Assistance Programs under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-6 ("Medicaid").

41.    Medicaid provides medical and health-related assistance for society's neediest and most vulnerable individuals, including pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of health care.  42 U.S.C. § 1396d(a).

42.    Medicaid is a joint federal-state health care program.  42 U.S.C. § 1396b.

43.    Medicaid is administered at the federal level by the Secretary of HHS, an agency of the United States, through CMS, which promulgates regulations, including minimum coverage parameters.

44.    If a state elects to participate in the program, the costs of Medicaid are generally shared between the state and the federal government.  42 U.S.C. § 1396a(a)(2).

45.     To receive federal funding, a participating state must comply with requirements imposed by the Act and accompanying regulations.

46.     Each state has its own Medicaid agency, which is responsible for developing CMS-approved programs, setting its own guidelines regarding eligibility and services, and administering claims.

47.     To receive payments and function as the Medicaid agency for Arizona, AHCCCS has agreed to an extensive contract with the federal government called the Medicaid State Plan ("MSP").[6] In the first page of the MSP, AHCCCS states as a condition for receiving federal Medicaid funds, that it "agrees to administer the program in accordance with the provisions of this State plan, the requirements of titles XI and XIX of the Act, and all applicable Federal regulations and other official issuances of the Department." MSP at 1. Through the MSP, AHCCCS has further agreed that it "has established and will maintain methods, criteria and procedures that meet all requirements of 42 CFR 455.13 through 455.21 and 455.23 for prevention and control of program fraud and abuse." *Id.* at ¶ 4.5. AHCCCS has also agreed to comply with 42 C.F.R. § 433.32 requiring maintenance of "an accounting system and supporting fiscal records to assure that claims for Federal funds are in accord with applicable Federal Requirements." *Id.* at ¶ 6.1

48.     To become an Arizona provider of any type for AHCCCS, a provider must

[6]https://www.azahcccs.gov/Resources/StatePlans/indexedstateplan.html

complete a Provider Enrollment Form.[7] The form includes a Provider Participation Agreement ("PPA") signed by the provider, stating, "I have read, understand, and agree to abide by all the terms and conditions set forth in this Agreement." PPA at 22. The PPA specifically references, among other things, the provider's obligation to comply with "all the federal, state, and local laws, rules, regulations, policies, standards, and executive orders governing or otherwise related to the performance of duties under this Agreement, *id.* at ¶ 7"; "all AHCCCS and/or Contractor Provider Manuals and Policy Guidelines, *id.* at ¶ 8"; and "all the applicable provisions contained in the False Claims Act and as amended by the Federal Fraud Enforcement and Recovery Act of 2009 (FERA)," *id.* at ¶ 24.

49.     To provide services for AHCCCS and receive federal monies, Mercy Care and Touchstone were required and are presumed to have executed a PPA.

50.     States receive federal money for their Medicaid programs through a variety of programs including Federal Medical Assistance Percentage ("FMAP") payments and block grants.

**B.     FMAP Payments**

51.     Through the FMAP process, the federal government (through CMS) agrees to reimburse a state such as Arizona (through its Medicaid agency, AHCCCS) in the amount of the state's FMAP proportion of the state Medicaid expenditures.  That is, FMAP payments are a form of matching funds—a state must spend its share of Medicaid costs to receive the federal payments.

---

[7] https://azahcccs.gov/PlansProviders/Downloads/ProviderRegistration/ProviderEnrollmentFillableForm.pdf

52.    FMAP payments are based on a state's per capita income compared to the national average and the percentages range from approximately 50% to 75%.  42 U.S.C. § 1396d(b).

53.    To qualify for these federal matching funds, each state Medicaid program must submit a plan to the Secretary of HHS for approval.  *See* 42 C.F.R. § 430, Subpart B.

54.    Arizona participates in the Medicaid program through the Arizona Health Care Cost Containment System ("AHCCCS") and receives FMAP payments.

55.    "AHCCCS is a $18 billion program that operates under an integrated managed care model, through a Research and Demonstration 1115 Waiver.  Contracted health plans coordinate and pay for physical and behavioral health care services delivered by more than 120,0000 health care providers to more than 2 million Arizonans."[8]

56.    The table below shows the FMAP percentage,[9] ranging from about 65% to 76%, allotted to AHCCCS by the federal government to provide medical assistance to persons enrolled in the Medicaid program:

| FY | FMAP | Multiplier |
|----|------|------------|
| 2023 | 75.76% | 3.13x |
| 2022 | 76.21% | 3.20x |
| 2021 | 76.21% | 3.20x |
| 2020 | 76.22%[10] | 3.21x |

[8] https://www.azahcccs.gov/AHCCCS/AboutUs.
[9]https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D
[10] FY 2020, FY 2021, and FY 2022 FMAPs reflect higher federal matching funding made available through the Families First Coronavirus Response Act (amended by the Coronavirus Aid, Relief, and Economic Security Act).  The additional funds are available

| FY | FMAP | Multiplier |
|------|--------|------------|
| 2019 | 69.81% | 2.31x |
| 2018 | 69.89% | 2.32x |
| 2017 | 69.24% | 2.25x |
| 2016 | 68.92% | 2.22x |
| 2015 | 68.46% | 2.17x |
| 2014 | 67.23% | 2.05x |
| 2013 | 65.68% | 1.91x |
| 2012 | 67.30% | 2.06x |

57. Medicaid FMAP financing is uncapped. To the extent that a State funds the program, it will receive the appropriate FMAP funds from the federal government.

**C.    Title XIX Block Grants**

58. States may also receive federal money through Title XIX block grants, which are fixed amounts predetermined by the federal government and provided for a specific programmatic purpose. Block grants can support services for non-Title XIX AHCCCS members, as well as services not covered by Medicaid for Title XIX AHCCCS members.

59. Besides FMAP payments, AHCCCS receives Title XIX money from the federal government through two block grants for which Touchstone and Mercy Care receive payments: Community Mental Health Services Block Grants (MHBG) and Substance Abuse Block Grants (SABG).

60. The purpose of the MHBG program is to assist the grantees in providing

---

to states from January 1, 2020, until the end of the public health emergency period for the COVID-19 pandemic. This act provided a 6.2 percentage-point increase to all FMAP rates for all states (including the District of Columbia). The next date for extension of the public health emergency period is January 11, 2023.

comprehensive community mental health services. The program is specifically intended to target adults with serious mental illness and children with serious emotional disturbances.[11]

61. The purpose of the SABG program is to assist the grantees in planning, implementing, and evaluating activities that prevent and treat substance abuse. [12]

62. Funded differently than FMAP payments, block grants are applied for, awarded, managed, monitored, and subject to oversight. *See* 42 U.S.C. § 300x.

63. Touchstone receives funding from block grants. On information and belief, its funding also comes from FMAP payments, based on a deferred revenue document referencing T19 or Title XIX and the primacy of FMAP as the source of Medicaid funding.

**D.    Payments**

64. The FMAP "reimbursement" actually takes the form of advance payments made quarterly to AHCCCS consisting of the FMAP percentage applied to AHCCCS's Form CMS 37 (Medicaid Program Budget Report) submitted for the quarter, which is an estimate of allowable Medicaid expenditures for that quarter.  42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(b).

65. In turn AHCCCS typically makes regular advance payments to contractors such as Mercy Care, which then make payments to providers such as Touchstone according to their individual contracts.

66. The administration of payments under block grants is less regimented and "most often administrated under the allocated agencies rules and regulations." AHCCCS

---

[11] https://www.samhsa.gov/grants/block-grants/mhbg
[12] https://www.samhsa.gov/grants/block-grants/sabg

Financial Reporting Guide for RBHA Contractors[13] (AHCCCS Financial Reporting Guide), Definitions: Block Grant, at 6.

67.    Mercy Care uses federal block grant funding to pay health care providers in many situations. A set amount is paid on a monthly basis "and revenue is recognized as the services are provided to Mercy Care members (encounters)." Mercy Care may adjust the funding depending on availability of funds and membership needs. Mercy Care Provider Financial Reporting Guide: Mercy Care Complete Care and Mercy Care RBHA[14] (Mercy Care Provider Financial Reporting Guide) at 8.

**E.    Accountability for Funds Received and Overpayments**

68.    Because Medicaid payment mechanisms typically involve advanced payments based on an estimate of a program's expenditures, overpayments typically occur when the provider does not meet the number of encounters for which it got paid or other circumstances in which the amount advanced exceeds expenditures for a time period. Regardless whether the payment source is FMAP or federal block grants, Touchstone, Mercy Care, and AHCCCS generally are responsible for refunding overpayments up the line of entities and ultimately to CMS/the federal government.

69.    At the end of each quarter, CMS requires AHCCCS to submit CMS Form 64 (Quarterly Medicaid Statement of Expenditures), which provides a report of actual expenditures for services provided under FMAP payments in the quarter. 42 C.F.R. §

---

[13]https://www.azahcccs.gov/PlansProviders/Downloads/FinancialReporting/FinancialReportingGuide_ACC_And_ACC_RBHA_ContractorsCYE23.pdf

[14]https://www.mercycareaz.org/assets/pdf/acc-providers/ref-materials/Mercy%20Care%20RBHA%20Provider%20FRG_09132019.pdf

430.30(c).

70.     CMS Form 64 requires Medicaid agencies such as AHCCCS to report activity related to overpayments, defined as "the amount paid by a Medicaid agency to a provider which is in excess of the amount that is allowable for services furnished under section 1902 [42 U.S.C. § 1396(a)] of the Act and which is required to be refunded under section 1903 [42 U.S.C. § 1396(d)] of the Act." 42 C.F.R. § 433.04.

71.     The summary sheet for CMS Form 64 requires, for example, identification of "recoveries" from fraud, waste and abuse efforts as well as the False Claims act, and other types of collections. It further provides data about adjustments made related to prior quarters, including a section titled Medicaid Overpayment Adjustment, which calculates the overpayment adjustments to occur in the particular quarter.

72.     Under 42 C.F.R. § 433.320(a)(2), a Medicaid agency must credit CMS on Form 64 "any overpayment subject to recovery on the earlier of – (i) the Form CMS-64 submission due to CMS for the quarter in which the State recovers the overpayment from the provider; or (ii) The Form CMS-64 due to CMS for the quarter in which the 1-year period following discovery, established in accordance with § 433.316, ends." The payment owed is further required "whether or not the overpayment has been recovered by the State from the provider." 42 C.F.R. § 433.320(a)(3).

73.     Accordingly, the next quarterly disbursement by CMS must then be "reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section … for any prior quarter."   42 U.S.C. § 1396b(d)(2)(A); 42 C.F.R. § 430.30(d)(2).  In other words, CMS is ultimately obligated

to reduce a quarterly disbursement by the amount of any overpayment AHCCCS made to a provider that has not been recovered.

74.    However, by statute, once AHCCCS has "discovered" or become aware of an overpayment, it has one year to recover or attempt to recover any overpayment before CMS makes such an adjustment on the quarterly federal disbursement to the state, subject to a few exceptions, such as if the overpaid entity is out of business.    42 U.S.C. § 1396b(d)(2)(C); 42 C.F.R. § 433.312(a).

75.    Once the year has passed, AHCCCS must report to CMS on the appropriate Form 64 any overpayment that has not been recouped, and that amount will be deducted from the next CMS disbursement.  42 C.F.R. § 433.320(a). The amount of adjustment is not necessarily the entire amount, but the proportion of the amount that represents federal monies.

76.    To meet its reporting requirements to CMS, AHCCCS requires its contractors such as Mercy Care to submit at least quarterly financial reports and an annual audit. AHCCCS Financial Reporting Guide, § 2.00 at 14-17.

77.    The quarterly reports and audit must include a balance sheet and income statement. Contractors must also provide a quarterly "Other Liabilities Report" that includes overpayments identified as "Deferred Revenue." § 4.05 at 70.

78.    Mercy Care is required to return unspent revenue at the end of the contract year or state fiscal year.  The AHCCCS Financial Reporting Guide states:

> The Contractor is expected to regularly determine from their providers whether there will be unspent funds by the end of the contract year or state fiscal year in the case of general funds

and block grant funds. *If general funds remain at the end of the fiscal year, providers are prohibited from recording deferred revenue; instead, these unspent general funds must be reported as a Payable to the Contractor and returned to the Contractor immediately for subsequent return to AHCCCS. Title XIX/XXI, Grant and County revenue may be deferred at the end of the provider's fiscal year only under extenuating circumstances.*

AHCCCS Financial Reporting Guide, § 5.12, at 69 (emphasis added)

79.    AHCCCS further requires contractors to submit certifications with their financial reports. Through those certifications, signed by the Chief Executive and Chief Financial Officer, the contractor attests "that the information submitted in the reports is current, complete, and accurate." AHCCCS Financial Reporting Guide, § 3.02 at 19.

80.    In turn, the Mercy Care Provider Financial Reporting Guide at pages 6-7 generally sets out the financial standards, record keeping, and fiscal monitoring required of Mercy Care's providers, including Touchstone, so that Mercy Care can provide the necessary current, complete and accurate financial information to AHCCCS.

81.    Mercy Care providers are typically required to file quarterly reports with Mercy Care that include information pertaining to services funded under FMAP monies and block grants.

82.    With respect to federal block grant funding the guide notes, as discussed above, that while money is advanced to the provider, it is recognized as revenue only "as the services are provided to Mercy Care members (encounters)." Mercy Care Provider Financial Reporting Guide at 8. The guide further states that based on the contract and source of funding, "block funding that is not encountered during the contract year will be

recouped by Mercy Care. In some cases, unencountered funding may be deferred to the following contract *if Mercy Care determines a need for additional services.*"    *Id.* (emphasis added).

83.    With respect to mandated quarterly and annual financial statements, the Mercy Care Guide requires a Statement of Financial Position and a number of other reports. *Id.* at 13-20.

84.    Pertinent here is the discussion of deferred revenue, which results from, among other things advance payments for services that are not encountered—that is, resulting from overpayments. The guide requires deferred revenue to be identified by the current or prior contract year; it further instructs that deferred revenue from a prior contract year "should be reclassified on the Statement of Financial Position as a Payable to Mercy Care." *Id.* at 16. It further requires that deferred revenue received and remaining at the end of a current year "should also be reclassified as a payable to Mercy Care in the 4[th] quarter statements and annual audit report." *Id.* Finally, Mercy Care requires its providers to get its approval to spend any deferred revenue after the contract year ends and after a determination by Mercy Care of need for additional services in the following contract year. *Id.*

85.    With respect to the annual audit as it relates to deferred revenue, Mercy Care requires a Supplemental Schedule of Financial Position Disclosures that "clearly" identifies the amount of deferred revenue directly attributable to Mercy Care, and "organized by Mercy Care Funding Source and Programs." *Id.* at 21.

86.    In short, Mercy Care's own Provider Financial Reporting Guide states that

unspent deferred revenue funds received by its providers, such as Touchstone, (a) must be reported as payable to Mercy Care and (b) must be returned after the completion of the contract year for subsequent return to AHCCCS:

87.    Mercy Care also requires providers to submit certifications with their financial statements. *Id.* at 13. Through those certifications, executed by the provider's Chief Financial Officer, the provider confirms "the reports have been reviewed for accuracy and completeness." *Id.* at 16.

88.    In addition to the above requirements for treating overpayments/deferred revenue, Mercy Care and Touchstone are also subject to the 60-Day Rule enacted in the Affordable Care Act (ACA). *See* 42 U.S.C. § 1320a-7k(d).

89.    The 60-Day Rule requires any "person" who has received an overpayment from Medicaid (or Medicare) "report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or contractor, as appropriate" within 60 days after the latter of the date the overpayment was identified or the date any corresponding cost report is due.  42 U.S.C. § 1320a-7k(d).

90.    The statute defines an "overpayment" as "any funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B).

91.    The statute defines "person" as "a provider of services, supplier, Medicaid managed care organization (as defined in section 1396b(m)(1)(A) of this title), Medicare Advantage organization (as defined in section 1395w–28(a)(1) of this title), or PDP sponsor (as defined in section 1395w–151(a)(13) of this title)." 42 U.S.C.

§ 1320a-7k(d)(4)(c)(i).

92.   Based on the definition above, both Touchstone and Mercy Care are "persons" subject to 60-Day Rule, but AHCCCS is not.

93.   The purpose of the rule is to ensure compliance with the statutes, promote high quality care, and protect government funds against fraud and improper payments. 81 Fed. Reg. 7653.

94.   The seriousness of this legislative purpose as well as the materiality of failing to return overpayments, is further shown by the fact that the ACA states that "any" overpayment constitutes an "obligation" for purposes of the reverse false claims provision of the FCA at 31 U.S.C. § 37219(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d)(3). Defining overpayments as an "obligation' establishes the basis for an FCA reverse false claim violation if overpayments are not returned as required.

95.   The seriousness of this legislative purpose as well as the materiality of failing to return overpayments is further shown by the stringent penalties imposed on any "person (including an organization, agency, or other entity, but excluding a beneficiary" that fails to comply with the 60-Day Rule by reporting and returning an overpayment. 42 U.S.C. § 1320a-7a(a)and (a)10. Such a person or agency "shall be subject" among other penalties to a penalty of $100,000 for each false record or statement made or caused to be made that is "material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program," plus "damages of not more than 3 times the total amount of remuneration . . . received."  42 U.S.C. § 1320a-7a(a)10. A person who fails to comply with the 60-Day Rule may also be subject to exclusion from federal and state

health care programs. *Id.*

96.    The federal government is also serious about using the FCA to prosecute providers who fail to refund overpayments. For example, Genesis Medical Center in Davenport, Iowa paid $1.88 million in 2018 to resolve a claim initiated by the Iowa United States Attorney's Offices for improperly retaining overpayments for overbilled hospital inpatient admissions claims.[15] When announcing the resolution of this claim, Marc Krickbaum, then-United States Attorney for the Southern District of Iowa, noted his office's intent to aggressively use the FCA to "ensure all health care providers play by the same rules" and know "there will be consequences if they fail to comply with state and federal regulations." The United States intervened and settled another case in 2017 in which the Florida First Coast Cardiovascular Institute, P.A. agreed to pay $440,000 to resolve allegations it delayed repayment of more than $175,000 in overpayments owed to various government healthcare payers, including Medicaid.[16] The OIG Special Agent in Charge, Shimon R. Richmond, remarked that failure to return overpayments is "unacceptable and diverts critical tax dollars from their intended purpose." He further noted commitment of OIG and its law enforcement partners "to hold health care companies accountable" who retain "funds to which they are not entitled."

97.    Defendants' knowledge of the 60-Day Rule and its importance is confirmed

---

[15] https://www.justice.gov/usao-sdia/pr/iowa-hospital-pay-188-million-resolve-false-claims-act-allegations-relating-improper

[16] https://www.justice.gov/usao-mdfl/pr/jacksonville-cardiovascular-practice-agrees-pay-more-440000-resolve-false-claims-act#:~:text=October%2013%2C%202017-,Jacksonville%20Cardiovascular%20Practice%20Agrees%20To%20Pay%20More%20Than%20%24440%2C000%20To,Acting%20United%20States%20Attorney%20W.

by the inclusion of its requirements in the contract between Mercy Care and Touchstone:

> In the event that Group [Touchstone] identifies any overpayments by Company [Mercy Care Plan], Group shall, as required under Section 6402(a) of the Patient Protection and Affordable Care Act, *report and return any and all such overpayments to Company within sixty (60) days of Group's identification of any and all such overpayments.* In addition, when reporting and returning any such overpayments by Company, Group must provide Company with a written reason for the overpayment (e.g., excess payment under coordination of benefits, etc.).

Physician Group Agreement between Mercy Care and Touchstone at ¶ 4.1.2. (emphasis added).

98.   The Mercy Care ontract with Touchstone also contains an agreement by Touchstone during the duration of the contract to remain "in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided hereunder, including, without limitation, statutes and regulations related to fraud, abuse, . . . self-referral, false claims and prohibition of kickbacks . . . ." *Id.* at ¶ 2.5.1(c).

## VI.   DEFENDANTS' VIOLATIONS OF THE FCA

### A.   Overview of Defendants' False Claims Act Violations

99.   Instead of returning overpayments to AHCCCS and ultimately CMS, Mercy Care and Touchstone received, retained, and converted to their own use overpayments received from CMS through AHCCCS, thereby illegally depriving the United States of funds that belonged to it.

100.   As large, sophisticated health care providers, both Touchstone and Mercy

Care were well aware of their obligations with respect to overpayments received from CMS through AHCCCS. Those obligations are specifically articulated in their contracts and operational documents and in the laws and regulations that they committed to comply with as a condition of being a Medicaid provider.

101. During his employment as Touchstone's COO, Relator obtained firsthand knowledge of Defendants' scheme through interaction with persons actually implementing the schemes, in particular Kathy Busby (current Touchstone board of directors member and board liaison), April Rhodes (former CEO of Touchstone), and Lance Monahan (former CFO of Touchstone).

102. The illegal scheme consisted of Touchstone's failure to return deferred revenue at the end of contract years as required by its own operational documents, as well as its failure to comply with the 60-Day Rule. Instead, Touchstone and Mercy Care conspired—that is they entered into negotiations and an agreement—that Touchstone would retain and convert all or portions of overpayments for its own use instead of returning them to AHCCCS through Mercy Care.

103. By agreeing to this treatment of overpayments, Mercy Care in turn violated the 60-Day Rule and allowed Touchstone to retain the overpayments without reporting them to AHCCCS, and failed to make any effort to report and recoup the agreed-to retained amounts.

104. Touchstone and Mercy Care omitted critical information about overpayments from their financial reports, making them false, and resulting in AHCCCS's submission of false statements to CMS, including through its Form 64s.

105.   Because Mercy Care's Form 64s failed to properly disclose overpayments retained by Touchstone, the United States was deprived of funds that should have been refunded and were instead knowingly converted for Defendants' use.

106.   Accordingly, Touchstone knowingly submitted statements and claims for payment to Mercy Care and Mercy Care knowingly submitted statements and claims for payment to AHCCCS that were false because they omitted proper information about unspent deferred revenue funds owed to AHCCCS needed to allow Mercy Care, in some instances, and AHCCCS to identify funds that should have been recouped. The scheme further caused Mercy Care to allow Touchstone to retain and convert rather than remit overpaid funds owed to AHCCCS and CMS.

107.   The false statements or omissions by the Touchstone and Mercy Care caused AHCCCS to unknowingly submit false statements to CMS that prevented identification of overpayments that should have been recouped.

108.   If Defendants had provided AHCCCS with truthful information about overpayments owed to the federal government and transmitted that information to the federal government, CMS would have adjusted subsequent disbursements to AHCCCS that would have had the effect of recouping the overpaid funds.

109.   The materiality of Defendants' conduct, is further evident, among other things, in the damage to the government of hundreds of thousands of dollars of lost overpayments. Simply put, the government did not get what it paid for—the encounters and services for which the payments were made.

110.   While there were multiple motivations for this scheme, an important one was

simply keeping the money rather than sending it back upstream. In some instances, these "adjust-offs" had other value, such as motivating or rewarding "good partners" and the value of looking good, that is, avoiding black marks for overpaying on the one hand and underspending on the other.

### B.    Amounts Touchstone Retained Rather than Refunded

111.    Relator is aware of retained amounts[17] of unspent and unrefunded deferred revenue as follows:

| Entity Retaining Unspent Deferred Funds and Timeframe of Receipt of Funds | Approximate Amount of Unspent Deferred Payments | Entity to which the Funds Were Immediately Owed | Upstream Entities to which the Funds Were Ultimately Owed |
|---|---|---|---|
| Touchstone Behavioral Health (prior to April 1, 2014 RBHA contract transition from Magellan to MMIC) | $300,000 (moved to income in about July 2017) | Mercy Care (originally owed to Magellan, then MMIC, and now Mercy Care) | AHCCCS, CMS |
| Touchstone Health Services (FY 2016-2019) | $2.8 million ($900,000 repaid to Mercy Care in 2021; $900,000 recognized as gain in FY 2021 and $1 million secretly absorbed as income) | Mercy Care | AHCCCS, CMS |

[17] This case involves failure to return only the portions of these amounts that are federally funded. For simplicity in this Amended Complaint, Relator refers to the full amounts known, with the expectation that any state portion of the amounts will be deducted from Defendants' liability.

| Entity Retaining Unspent Deferred Funds and Timeframe of Receipt of Funds | Approximate Amount of Unspent Deferred Payments | Entity to which the Funds Were Immediately Owed | Upstream Entities to which the Funds Were Ultimately Owed |
| --- | --- | --- | --- |
| Touchstone Health Services (FY 2020-22) | $476,227 (currently retained as deferred revenue) | Mercy Care | AHCCCS, CMS |
| Touchstone Health Services (FY 2018) | $242,000 (recognized as gain in FY 2021) | Cenpatico | AHCCCS, CMS |

112. On information and belief, based on his interactions with entities and persons involved in the scheme, Relator is also aware of additional conduct similar to that alleged in this Amended Complaint including, for example,

a) the La Frontera agency owed Mercy Care $2 million and the entities agreed to split the amount; that is, La Frontera refunded only $1 million to Mercy Care;

b) Spectrum Health Group, Inc.[18] owed overpayments to Mercy Care in the millions but did not report or pay the amount owed;

c) Southwest Behavioral & Health Services[19] owed overpayments to Mercy Care in the millions but did not report or pay the amount owed.

---

[18] https://www.spectrumhealthcare-group.com.
[19] https://www.sbhservices.org/history-mission-milestones.

**C.    Defendants Knowingly Schemed to Retain and Convert Monies Overpaid by the Government.**

113.    As Touchstone's COO and Chief Compliance and Ethics Officer, Relator's knowledge is based on his personal experience working at Touchstone from December 2016 through June 1, 2022.  His job responsibilities made him aware of and integrally involved in Touchstone's management at a high level.

114.    Because of his position, Relator participated in and learned about communications and meetings with Mercy Care high-level administrators as well as other providers. During his tenure at Touchstone, and with respect to the non-returned amounts identified in ¶ 111 above, Relator was not aware of any efforts to return or even identify those amounts at the end of the relevant contract year; nor was he awaare of specific requests to retain those monies for specific activities or "extenuating circumstances," as required by AHCCCS and Mercy Care's own Provider Financial Reporting Guide. Similarly, Relator was not aware of any efforts by Touchstone or Mercy Care to report or return the identified deferred revenue in a manner consistent with the 60-Day Rule.

115.    Relator first became aware of Defendants' scheme and violations in 2017 at a meeting with Donn Merrill and Bryan Davey (respectively, former CFO and CEO of Touchstone).  They were reviewing revisions Merrill had made to a monthly profit and loss statement, and Davey jokingly said something to the effect that Merrill found $300,000 just sitting around.  In fact, $300,000 was added to revenue in that statement, likely in July 2017.

116.    Relator was aware that Touchstone had been carrying a deferred payment

amount of $300,000 from FY 2015 that it originally owed to Magellan and then to MMIC. After the above statements made by Merrill and Davey, a $300,000 amount characterized as deferred revenue disappeared from Touchstone's books. Relator concluded that the joked-about "found" income could only have come from a favorable disappearance of that $300,000 in deferred revenue.

117.   This "disappearance" occurred sometime after Relator became aware that Merrill learned that some other agencies had not received any notices from MMIC (now Mercy Care) about money owed. Relator was aware that Touchstone's then-auditor from Eide Bailey told him that some agencies had received formal letters when they owed money—from which Merrill likely inferred that no news meant the amount owed was not being tracked.   One can infer from Merrill's actions that he felt he could convert the deferred revenue into income without notice or penalty, which he did.

118.   In late 2019, Relator became aware of additional violations by Touchstone when he attended a meeting on December 10th between Mercy Care executives, including Sherman Moore, its finance director, and leadership staff from Touchstone, including Touchstone's chief financial officer, Lance Monahan. During the meeting, Moore reported that Touchstone had recorded $2.8 million in deferred revenue funds that the company accrued throughout prior fiscal years.   Relator was immediately concerned that Touchstone had accrued such a large amount of deferred revenue because he knew the company was legally and contractually required to pay those funds back to CMS through Mercy Care and AHCCCS.

119.   After that meeting, Relator made continuous efforts to resolve the deferred

- 30 -

revenue issue, in terms of establishing the actual amount owed by Touchstone and then taking the appropriate steps to return it to Mercy Care, and ultimately to AHCCCS and CMS. His efforts included numerous direct discussions with Touchstone CFO Monahan and April Rhodes.

120. April Rhodes has been the CEO at Spectrum since September 2015. In December 2019, Rhodes signed a management services agreement with Touchstone and accepted the position of the company's Interim CEO, which she held until April 2021.[20]

121. Neither Monahan nor Rhodes provided him an adequate rationale for keeping such a large sum of deferred revenue in Touchstone's financials or a persuasive justification for Touchstone's failure to reimburse overdue funds to Mercy Care. To the contrary, Monahan admitted that he had routinely sidestepped reimbursing deferred revenue funds to MMIC (now Mercy Care) when he worked from 2006 to 2010 at another provider, Terros Health.

122. On December 16, 2019, Relator and Rhodes participated in an introductory meeting at Touchstone. During their meeting, Relator told Rhodes that Touchstone had realized an overpayment of unspent deferred revenue funds, delivered from AHCCCS, in the amount of $2.8 million. He then advised her that the payback of those funds, in accordance with Touchstone's contract with Mercy Care, needed to be addressed

123. Rhodes responded by directing Relator not to take any action regarding the reporting and reimbursement of Touchstone's accrued deferred revenue. She told Relator

---

[20] From December 2019 through April 2021, Rhodes served as CEO of both Spectrum and Touchstone.

that she was personal friends with Lorry Bottrill, the President and CEO of Mercy Care, and that she planned to speak with Bottrill to have some, or all, of Touchstone's accrued deferred revenue "adjusted off" the company's financials.

124.    Rhodes further told Relator that she knew of other providers, including Spectrum and Southwest, that have made similar arrangements to "adjust off" accrued deferred revenue amounts owed to Mercy Care.

125.    Relator was surprised to hear about this plan to simply "adjust off" Touchstone's deferred revenue from the company's financials. He understood such an action to violate the Mercy Care Financial Reporting Guide which, as discussed above, prohibits retaining deferred revenue and requires Touchstone to return the funds to Mercy Care immediately, or at the latest after the end of a contract year, for subsequent return to AHCCCS and CMS.

126.    On January 28, 2020, Rhodes told Relator that she met with Bottrill the previous day at which time Bottrill verbally agreed to "adjust Touchstone's overpayment off."    At that time, Rhodes indicated that the amount of accrued deferred revenue Touchstone owed to Mercy Care was $2.8 million.

127.    On February 5, 2020, Relator received a copy of an email sent to Touchstone by Mercy Care's finance department with Touchstone's Fiscal Year 2019 Deferred Revenue Analysis Report.

128.    The e-mail made it clear to Relator that Mercy Care sends Touchstone a monthly report summarizing estimated deferred revenue that may be due to Mercy Care. The report itself made it clear that overpayments must be returned to Mercy Care. It stated,

"The Arizona Department of Behavioral Services requires that all revenue be encountered for appropriate, authorized Title 19 or Non-Title 19 expenditures or returned to Mercy Care of Arizona." The document further confirms that the "deferred" or "deferral" descriptive means overpayments because it identifies the "Deferred Amt" as revenue that was received but not supported by encounter data.

129. Mercy Care's 2019 Deferred Revenue Analysis Report also stated that Touchstone's deferred revenue amount for FY 2019 (October 1, 2018, through September 30, 2019) was about $1.8 million ($1,759,768), not $2.8 million as disclosed to Relator in earlier discussions.

130. Relator attended several meetings in 2020 that confirmed (1) Touchstone's knowledge that it owed deferred payments of about $2.8 million to Mercy Care, (2) Touchstone's efforts to avoid refunding the payments by negotiating with Bottrill an adjust-off or complete forgiveness that deprives ACCCHS and the federal government of refunds to which they are entitled, (3) Touchstone's successful cover-up of about $1 million in deferred revenue in the final settlement, and (4) discussions of how to document the transaction to prevent detection.

131. One such meeting occurred on February 20, 2020, when Relator met with CFO Monahan and CEO Rhodes to discuss Touchstone's accrued deferred revenue. Among other things, Monahan claimed that Mercy Care did not want the money back because it was a "black mark" with respect to managing government funds. Rhodes stated that Bottrill said "she would work with us." Rhodes nonetheless did not put anything about the negotiations into a presentation for the Touchstone Board, saying "Let's not put

- 33 -

that in writing in places … where, like if somebody printed this and took it somewhere, or, I mean you just never know."

132.   Other interactions Relator had on this issue made it clear that that Rhodes was working with Mercy Care on a significant "adjust off" of overpayments owed by Touchstone.

133.   In October 2020, Relator raised the overpayment issue with Rhodes in the course of preparation for an annual board retreat.  Rhodes had made a request to Mercy Care to waive the deferred payments owed to it.  There was also an ongoing discussion that Mercy Care had underpaid Touchstone about $1 million in claims. Rhodes told Relator she had received an e-mail from Tad Gary, the COO at Mercy Care, who said that he was waiting to hear how the Touchstone claims underpayment dispute was resolved before agreeing to any settlement terms related to overpayments.

134.   On November 11, 2020, Relator participated in a meeting with Rhodes, Monahan, and Mercy Care COO Gary, among others.  During the meeting, the participants addressed the underpayment dispute, which required additional analysis before resolution. Mercy Care also proposed a resolution of the overpayment issue that would include forgiving about half the amount as an "encounter credit" taking into account resolution of the underpayment issue and having Touchstone repay the remainder.

135.   Relator is not aware of provision in the statutes, regulations, contracts, and agency operational documents that allow a contractor to just "forgive" the obligation to return overpayments/deferred revenue to the federal government. As discussed above, exceptions to the refund requirement had to be requested, articulated, and approved, and

typically were allowed only under extenuating circumstances. Simply letting a provider off the hook for the money is not an option.

136. On November 13, 2020, Rhodes and Monahan participated in a follow-up conversation with Relator. Rhodes and Monahan determined, among other things, that Touchstone would not raise the issue of the about $1 million in overpayment that they knew Touchstone had received in FY 2016 and 2017 but was not a part of the negotions with Mercy Care; Monahan commented that he viewed Mercy Care's approach as an "under the table pass" on recouping the earlier amount. Rhodes and Monahan further commented that the language of any agreement should state clearly that it resolves *all* overpayment amounts, thereby wiping out the prior $1million amount owed by Touchstone.

137. At a Touchstone board meeting on December 2, 2020, Rhodes addressed the deferred payment issue. She emphasized that Touchstone would not dispute the amount of deferred payment owed as $1.8 million, even though Touchstone's books recorded the amount owed as about $2.8 million. Rhodes also said that Touchstone would seek a full release, thereby eliminating Mercy Care's ability to recoup the additional $1million of deferred payment on Touchstone's books. The intent not to raise the additional $1 million with Mercy Care was reiterated at a January 27, 2021Touchstone board of directors meeting in which Monahan recounted the numbers and touted with respect to Mercy Care's belief that Touchstone owed less money—that Mercy Care "can believe that."

138. On February 3, 2021, a meeting occurred between Touchstone and Mercy Care in which Mercy Care offered a settlement that would adjust off $900,000 thereby

reducing the amount owed to $900,000 because it wanted the issue resolved and because Touchstone was a "good partner."

139.   Touchstone's audited financial statements for years ended on September 30, 2020 and 2019 (signed on July 23, 2021) state that Touchstone and Mercy Care entered into an agreement in March, 2021 with respect to the identified $1.8 million of deferred revenue. The terms were that Mercy Care forgave amounts for all periods through September 30, 2019; Touchstone agreed to pay Mercy Care $900,000 over time; and the remaining $900,000 would be recognized as a gain for the year ending September 30, 2021. In short, the agreement decreased Touchstone's obligation to decrease the amount of refunded overpayments to $900,000 and to convert $900,000 of overpayments to its own use.

140.   In a board meeting on December 3, 2021, Touchstone's current CEO, Eddy Broadway, apprised the board that Touchstone had accumulated in excess of $400,000 in deferred revenue, as recorded in the October 2021 financials.

141.   Broadway reviewed possible solutions to address the deferred revenue with the board, which included "there's kind of the Terros way of sitting on it, hiding it, and don't, not showing anything until you're asked or the Jeff Jordy way which is let me write you a check as soon as I can."  Board member Kathy Busby responded that "I kind of like Terros," which resulted in laughter and agreement amongst the board members.  After some discussion, Busby instructed Broadway: "I say stick our heads in the sand until they come for it and drag it on and drag it on and see if we can't cut some other deal." Broadway responded: "it's not a bad idea, it's worked before."  Busby responded that

"Donn did it," referring to Donn's former role with Touchstone as CFO.  Donn admittingly stated: "I've done it with the best of them."

142.  Touchstone's financial report for January 2022 presented to its Board showed additional deferred revenue as of 1/31/2022 of $476,227 for FY 20-22, the bulk of which was accrued in FY 2020. Relator is not aware that any return of that overpayment has been made.

143.  On February 24, 2022, Relator met via Zoom with Touchstone's Controller, Craig Sheen, and a consultant Touchstone hired.  Sheen stated that when he was formerly employed at SB&H, the CFO and CEO would "always" negotiate deferred revenue with Mercy Care.  Sheen stated the amounts SB&H's CFO and CEO would adjust off were "in the millions."

144.  In the course of the discussions about deferred revenue in 2020, Relator learned that Touchstone also owed about $240,000 in deferred revenue to Cenpatico, another regional behavioral healthcare administrator. Although Rhodes said she would discuss the issue with Cenpatico, Relator heard nothing further on the issue.

145.  Touchstone's Audit for Years Ended September 30, 2021 and 2020 indicates that the overpayment occurred in FY 2018 as a result of less than the required number of encounters and that an accrued amount of $242,000 was recorded as revenue in fiscal 2021. In other words, the overpayment was not returned at the end of the contract year or within the 60-Day Rule timeframe and several years later was converted to revenue belonging to Touchstone when it should have been returned to CMS.

146.  Mercy Care is well acquainted with its obligation to return unspent revenue

at the end of the contract year or state fiscal year.  As previously discussed above, not only is refunding overpayments a statutory obligation, but it is also set forth in the AHCCCS Financial Reporting Guide.  There is little ambiguity in the requirement: "If general funds remain at the end of the fiscal year, providers are prohibited from recording deferred revenue; instead, these unspent general funds must be reported as a Payable to the Contractor and returned to the Contractor immediately for subsequent return to AHCCCS. Title XIX/XXI, Grant and County revenue may be deferred at the end of the provider's fiscal year only under extenuating circumstances."  AHCCCS Financial Reporting Guide, § 5.12, at 69. This requirement made it clear to Defendants that unspent deferred revenue funds/overpayments belonged to the United States.

147.   In turn, and as previously discussed, Mercy Care included in its own Provider Financial Reporting Guide—and therefore had actual knowledge of—the requirement that unspent deferred revenue funds received by providers, such as Touchstone, must be reported as payable to Mercy Care and must be returned after the completion of the contract year for subsequent return to AHCCCS and CMS along with a written reason for the overpayment. This requirement made it clear to Defendants that unspent deferred revenue funds/overpayments belonged to the United States.

148.   Also as discussed above, requirements of the contract between Mercy Care and Touchstone shows that Defendants acted with actual knowledge that they were illegally retaining or causing to be retained funds that belonged to the federal government.

149.   Other aspects of the conduct described above give rise to a strong inference that Defendants knew Touchstone was retaining money that belonged to the federal

government and knowingly deprived the government of that money. Touchstone executives and board members joked about hiding their heads in the sand and returning money that belongs to the government only if they are caught "holding the bag" so to speak. They further delighted in sneakily getting Mercy Care to release Touchstone's obligation to repay a million dollars in the course of negotiating treatment of $1.8 million in deferred revenue. In addition, Relator heard numerous accounts of Mercy Care's willingness to do deals to prevent having to collect overpayments, let alone admit that they happened. This conduct is strong circumstantial evidence that Defendants knew what they were doing was illegal, but went ahead and deliberately deprived the government of monies owed it, and converted that money to their own use.

## VII.    CAUSES OF ACTION

### COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A)
**(FCA: Presentation of False Claims)**
**(Touchstone and Mercy Care)**

150. Relator re-alleges the allegations set forth in paragraphs 1 through 149, as if fully set forth herein.

151. This a claim for treble damages, statutory penalties, and other relief under the FCA.

152. Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. §

3729(a)(1)(A).

153.   Each of the false or fraudulent claims Defendants submitted, or caused to be submitted, is a separate violation of 31 U.S.C. § 3729(a)(1)(A), which supports the imposition of statutory penalties for each violation.

154.   In addition, the United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

155.   The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions and legal authorization to make payments to Defendants.

156.   Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

157.   Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial, which amount is statutorily required to be trebled.

### COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)
**(FCA: Using False Statements Material to False Claims Paid)**
**(Touchstone and Mercy Care)**

158.   Relator re-alleges the allegations set forth in paragraphs 1 through 149, as if fully set forth herein.

159.   This a claim for treble damages, statutory penalties, and other relief under the FCA.

160.   Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or

falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

161. Defendants' false certifications and representations were made for the purpose of ensuring that the United States paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

162. The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the falsity of these records or statements, authorized payments to be made, made such payments, and has been damaged.

163. The false records or statements Defendants knowingly made to the United States were material to the United States' decisions to make payments to Defendants.

164. Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

165. Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

### COUNT III – Violation of 31 U.S.C. § 3729(a)(1)(C)
### (FCA: Conspiracy)
### (Touchstone and Mercy Care)

166. Relator re-alleges the allegations set forth in paragraphs 1 through 149, as if fully set forth herein.

167. This a claim for treble damages, statutory penalties, and other relief under

the FCA.

168. Through the acts described above and otherwise, Touchstone and Mercy Care conspired to violate the False Claims Act at 31 U.S.C. § 3729(A)(1)(A), (B), (D), and (G) when they negotiated and agreed that Mercy Care would forgive or award as "encounter credit" approximately $900,000 and Touchstone, in exchange, would refund approximately $900,000 to Mercy Care.

169. The United States was damaged by this conspiratorial conduct that resulted in Touchstone's retention of money that was owed to and belonged to the United States.

### COUNT IV – Violation of 31 U.S.C. § 3729(a)(1)(D)
**(FCA: Conversion of Government Funds)**
**(Touchstone and Mercy Care)**

170. Relator re-alleges the allegations set forth in paragraphs 1 through 149, as if fully set forth herein.

171. Through the acts described above and otherwise, Defendants knowingly kept possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property, in violation of 31 U.S.C. § 3729(a)(1)(D).

172. The United States, unaware of Defendants' possession, custody, or control of property or money used, or to be used, by the Government and unaware of Defendants' knowing delivery of, or causing to be delivered, less than all of that money or property, has been deprived of money or property that it otherwise would have received.

173. By reason of Defendants' violations of the FCA, the United States has suffered and may continue to suffer economic loss.

## COUNT V – Violation of 31 U.S.C. § 3729(a)(1)(G)
### (FCA: Avoiding or Decreasing an Obligation to Pay)
### (Touchstone and Mercy Care)

174.  Relator re-alleges the allegations set forth in paragraphs 1 through 149, as if fully set forth herein.

175.  This a claim for damages and other relief under the FCA.

176.  Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

177.  An "obligation" includes "an established duty, whether or not fixed, arising from an express or implied contractual ... relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment," 31 U.S.C. § 3729(b)(3), including, but not limited to, "any overpayment [from Medicaid] retained by a person after the deadline for reporting and returning the overpayment." 42 U.S.C. § 1320a–7k(d)(3).

178.  An "overpayment" is defined as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a–7k(d)(4)(B).

179.  A person or entity that receives an overpayment of Medicare or Medicaid funds must report and return the overpayment within 60 days of the date on which the

- 43 -

overpayment was identified. 42 U.S.C. § 1320a–7k(d)(1)–(2).

180. The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted.

181. Defendants knowingly made or caused to be made false and fraudulent representations and claims to the United States that were material and deprived the United States of money Defendants were obligated to repay to the United States.

182. By knowing they had received and retained or caused to be retained deferred revenue to which they were not entitled, or improperly caused an obligation to the United States to be decreased, yet failing to self-disclose the misconduct to the United States or to refund the deferred revenue, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

183. By reason of Defendants' violation of the FCA, the United States has suffered and may continue to suffer economic loss.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Relator, on his own behalf and on behalf and in the name of the United States, requests that the Court:

i. Enter judgment for the United States and Relator and against Defendants;

ii. Order Defendants to cease and desist from violating the FCA;

iii. Award the United States Government, through a money judgment against Defendants, the full amount of damages the United States sustained because of Defendants' actions, plus all other relief provided by 31 U.S.C. § 3729(a), including, without limitation, statutory penalties and treble damages;

- 44 -

iv.    Award Relator the maximum relator's share available under the FCA, for bringing this action as provided in 31 U.S.C. § 3730(d);

v.    Award Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by the FCA;

vi.    Award interest on money judgments, as provided by law; and

vii.    Grant such other relief for the United States and Relator as the Court deems just, necessary, and proper.

## IX.    REQUEST FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby requests a trial by jury.

Dated: January 12, 2023              HALUNEN LAW


                                     *s/ Susan M. Coler*
                                     Susan M. Coler,* MN #0217621
                                     80 South 8th Street, Suite 1650
                                     Minneapolis, Minnesota 55402
                                     Telephone: (612) 605-4098
                                     Fax: (612) 605-4099
                                     coler@halunenlaw.com
                                     (*pro hac vice*)

                                     Leonard Aragon, AZ #020977
                                     HAGENS BERMAN SOBOL SHAPIRO LLP
                                     11 West Jefferson Street, Suite 1000
                                     Phoenix, Arizona 85003
                                     Telephone: (602) 840-5900
                                     Fax: (602) 840-3012
                                     leonard@hbsslaw.com

                                     *Attorneys for Plaintiff/Relator Craig Thomas*