**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America *ex rel.* Craig Thomas,<br><br>  Plaintiff/Relator,<br><br>v.<br><br>Mercy Care, and Touchstone Behavioral Health dba Touchstone Health Services,<br><br>  Defendants. | No. CV-22-00512-PHX-JAT<br><br>**ORDER** |

Pending before the Court are Defendant Mercy Care and Defendant Touchstone's Motions to Dismiss the Second Amended Complaint ("SAC"). (Docs. 38, 39). Plaintiff responded, (Docs. 41, 42), the Government filed a Statement of Interest, (Doc. 40), and the Defendants replied, (Docs. 44, 45). The Court now rules on the Motions.

**I.   BACKGROUND**

The following account treats the well-pleaded factual allegations of the SAC as true for purposes of the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A.  Parties and Regulatory Framework**

*Qui tam* Plaintiff and Relator ("Relator") is a resident of Arizona and was the Chief Operating Officer of Defendant Touchstone Health Services ("Touchstone") from December 2016 through June 1, 2022. (Doc. 36 at 3). Relator brings this action on his own behalf and on behalf of the United States pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* Defendant Mercy Care is a managed care organization ("MCO")

that operates health plans offering integrated care to children, adults and seniors covered by the Arizona Health Care Cost Containment System ("AHCCCS") through a network of providers. Defendant Touchstone is a provider and sub-contractor for Mercy Care that has contracted to provide home and community-based health services for Arizonans. (*Id.* at 4).

Medicaid is a healthcare assistance program jointly financed by the federal government and the states and administered by the states in accordance with federal regulations. (*Id.* at 8). Arizona's Medicaid program is administered by AHCCCS, a state agency. (*Id.* at 9). Each quarter, based on a state's estimate of anticipated Medicaid expenditures, the Centers for Medicare & Medicaid Services ("CMS")—a federal agency that administers the Medicaid program—makes an advance payment of federal funds to the state. 42 C.F.R. § 430.30(a)(2). The state, through agencies like AHCCCS, draws down those funds to pay providers. *Id.* § 430.30(d)(3). Because Mercy Care is an MCO, AHCCCS provides it with periodic payments calculated by an actuarily determined fixed rate ("capitation payment") for each of its eligible Medicaid beneficiaries. (Doc. 37 at 12). The capitation payment is made for each enrollee regardless of whether they have received any services during the period the payment covers. (*Id.*) Under the applicable contract, "any savings remaining to [Mercy Care] as a result of favorable claims experience and efficiencies in service delivery at the end of the Contract term may be kept by [Mercy Care]." (*Id.* at 13).

Touchstone entered into a provider contract with Mercy Care initially in 2014 and again in 2017. *Id.* at 14. Under the agreements, Touchstone provides medically necessary health services to its members and submit claims certified as accurate, complete, and truthful. (*Id.* at 14–15). Mercy Care pays Touchstone on a fee-for-service basis for covered (non-Medicaid) services. (*Id.* at 15). According to Mercy Care-generated documents providing information about deferred revenue and provided to Touchstone, Mercy Care pays Touchstone a fixed amount per month in advance to provide Title XIX ("T19") (Medicaid) services, and then tracks the actual amounts Touchstone earned in that period through T19 encounters. (*Id.*)

### B. Relator's Allegations

Relator states that three events led to the filing of this action against the Defendants. First, in 2017, Relator met with the former CFO and CEO of Touchstone for the purpose of reviewing the revisions to a monthly profit and loss statement. At that meeting the CEO "jokingly" said that the CFO had "found $300,000 just sitting around" and $300,000 had been added to revenue in the monthly statement. (Doc. 37 at 34–35). Relator was aware that Touchstone had been carrying a deferred revenue amount of $300,000 from prior to 2014 that it originally owed to Magellan and then to MMIC, which merged into Mercy Care. (*Id.* at 35). After the conversation with the CEO and CFO, Relator became aware that a $300,000 amount characterized as deferred revenue disappeared from Touchstone's financial records and was added as deferred revenue. (*Id.*) Relator claims that the Touchstone CFO became aware that the $300,000 was not being tracked by Mercy Care by talking to Touchstone's then-auditor who told the CFO that some agencies had received formal letters telling them they owed money and Touchstone had not received one. (*Id.*)

Second, Relator became aware of additional overpayments in the form of deferred revenue held by Touchstone in late 2019. (*Id.* at 36). He attended a meeting with Touchstone executives on December 10 at which the finance director reported that Touchstone had accrued about $2.8 million in deferred revenue funds throughout previous fiscal years. (*Id.*) Relator made continuous efforts to resolve the deferred revenue issue and reports that the CFO admitted he had "routinely sidestepped reimbursing revenue funds to MMIC (now Mercy Care) when he worked from 2006 to 2010 at another provider, Terros Health." (*Id.* at 36–37). The new Touchstone CEO then made plans to enter into an arrangement with the CEO of Mercy Care to "adjust off" Touchstone's deferred revenue from the company's financials. (*Id.*) On February 5, 2020, Relator received a copy of an email sent to Touchstone by Mercy Care's finance department with Touchstone's Fiscal Year 2019 Deferred Revenue Analysis Report. (*Id.* at 37–38). The report stated "[the] Arizona Department of Behavioral Services requires that all revenue be encountered for appropriate, authorized Title 19 or Non-Title 19 expenditures or returned to Mercy Care of

Arizona." (*Id.* at 38). Plaintiff believes the document confirms "deferred" revenue meant "overpayments" because it identifies "Deferred Amt" as revenue that was received but not supported by encounter data. (*Id.*) The Mercy Care report calculated deferred revenue to be $1,759,768 for 2019 instead of the $2,800,000 reported by Touchstone. (*Id.*)

Over the course of 2020, Relator attended meetings with Touchstone executives where he believes the CEO and CFO were attempting to avoid paying the $1 million difference between Touchstone and Mercy Care calculations of deferred revenue and adjust off some of the payments owed to Mercy Care. (*Id.*) In one such meeting, the CFO stated that Mercy Care did not want the money back because it was a "black mark" with respect to government funds. (*Id.*) Later, the CFO responded to the CEO's request for Touchstone's deferred revenue by year with a spreadsheet that stated deferred revenue was only $1,814,575 for 2019 instead of the originally reported $2.8 million. (*Id.* at 39). In October 2020, Relator raised the overpayment issue with Touchstone's CEO. (*Id.*) The CEO had made a request for Mercy Care to waive the deferred payments owed and there was an ongoing discussion that Mercy Care had underpaid Touchstone about $1 million in claims. (*Id.*)

On November 11, 2020, Relator participated in a meeting with the Touchstone and Mercy Care executives where the attendees addressed the underpayment issue and Mercy Care proposed a resolution that would take care of the overpayment and underpayments issues where Mercy Care would forgive about half of the $1.8 million as an "encounter credit" to make up for the $1 million in underpayments. (*Id.*) During follow-up meetings, Touchstone executives determined that they would not dispute the amount of deferred revenue owed and accepted Mercy Care's calculated $1.8 million; and decided that any agreement made should state clearly that it resolves all overpayment amounts, thereby wiping out the $1 million difference. (*Id.* at 40). Of note, at a meeting with Touchstone's board, Touchstone's CFO remarked that Mercy Care "can believe that" Touchstone owed less money than recorded on the Touchstone books. (*Id.*) On February 3, 2021, Touchstone and Mercy Care entered into an agreement where Touchstone would pay Mercy Care

$900,000 over time and the remaining $900,000 would be recognized as a gain for Touchstone for the year ending September 30, 2021. (*Id.*)

Finally, Relator became aware of additional retained deferred revenue in the amount of $476,227 at a board meeting in December 2021. (*Id.* at 42). At that meeting, the current CEO of Touchstone reviewed possible solutions to address the deferred revenue, which included him saying "there's kind of the Terros way of sitting on it, hiding it, and don't, [sic] not showing anything until you're asked or the Jeff Jordy way which is let me write you a check as soon as I can." (*Id.*) The board discussed the options until a board member stated, "I say the stick our heads in the sand until they come for it and drag it on and see if we can't cut some other deal." At that point, that board member and Touchstone's former CFO confirmed that the former CFO (who was CFO during the $300,000 allegation) had engaged in similar behavior in the past. (*Id.*)

Relator lists five counts of violations of the FCA in the SAC. However, in his responses to Defendants' motions to dismiss, (Docs. 41, 42), Relator states that he will not pursue Counts I and II against either defendant. Accordingly, the Court grants Defendants' motions to dismiss Counts I and II. Additionally, Relator states that he will not pursue the conversion or false claim allegations against Defendant Mercy Care for the alleged failure to return a $300,000 overpayment in 2017. (*Id.*) The Court will therefore not discuss those allegations in this order.

After the voluntary dismissal, Relator alleges Defendants' conduct violated three provisions of the FCA: Count III, a violation of 31 U.S.C § 3729(a)(1)(C) by conspiring to commit violations of FCA provisions §§ 3729(a)(1)(D) and (G); Count IV, a violation of § 3729(a)(1)(D) for conversion by failing to return money in their possession that rightfully belongs to the government; and Count V, a violation of § 3729(a)(1)(G)—a reverse false claim by knowingly avoiding or decreasing an obligation to return money to the government.

## II. LEGAL STANDARD

### A. Pleading Requirements

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A successful motion to dismiss under Rule 12(b)(6) must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

FCA claims involve fraud, and accordingly they must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011). Under the rule, the party alleging fraud must "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted). Rule 9(b) serves dual purposes: (1) to give defendants fair notice of the allegations of fraud so they have an opportunity to rebut specific accusations, and (2) to deter the harm caused by unsubstantiated fraud complaints. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). In some cases, a plaintiff may allege that a defendant has engaged in fraudulent conduct that is the entire basis for the claim despite fraud not being a necessary element in the claim. There, the Ninth Circuit has said "the claim is said to be 'grounded in fraud' or 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v.*

*Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003).

### B. False Claims Act

The FCA, 31 U.S.C. §§ 3729 *et seq.*, provides for "the recovery of civil penalties from those who knowingly present a false or fraudulent claim to the federal government for payment, or knowingly use a false record to avoid or decrease an obligation to pay the federal government." *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1467 n.1 (9th Cir. 1996). The Supreme Court has held that the FCA is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White Co.*, 390 U.S. 228, 233 (1968); *see also United States v. McLeod*, 721 F.2d 282, 284–85 (9th Cir. 1983).

The FCA authorizes individuals (relators) to file civil suits known as "*qui tam* actions" on behalf of the federal government against persons who violate the FCA. 31 U.S.C. § 3730. Violations of the FCA include but are not limited to when a person has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or conspires to commit a violation of the previous two provisions. *Id.* § 3729(a)(1)(C), (D), and (G). The FCA defines "knowing" as having actual knowledge of information or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b)(1).

### III. ANALYSIS

Defendants have submitted separate motions to dismiss and the analysis for their motions differs based on the factual allegations. However, Relator has alleged violations of the same provisions of the FCA for each Defendant, so the Court will analyze each motion's merit by count.

### A. Constitutionality

As a preliminary issue, both Defendants assert that the FCA violates "the Executive Vesting Clause (U.S. Const. art. II, § 1), the Appointments Clause (U.S. Const. art. II, § 2), the Take Care Clause (U.S. Const. art. II, § 3), the Due Process Clause (U.S. Const. amend. V), and the doctrine of separation of powers." (Doc. 38 at 22, Doc. 39 at 5 n.3). However, neither Defendant develops this argument further than citing the concurrence and dissent of the recent *United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023). Nonetheless, Mercy Care argues that "subsequent developments suggest that the *Kelly* decision is incorrect and may be overruled" but fails to point out subsequent developments beyond the nonbinding *Polanksy* concurrence and dissent. (Doc. 38 at 22). Mercy Care also does not make any argument as to why the FCA is unconstitutional under the above-referred constitutional provisions. Touchstone largely reiterates Mercy Care's conclusive argument. Because Defendants' constitutionality arguments are conclusory and undeveloped, this Court summarily rejects them. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot manufacture arguments [for a party] . . . . Rather, we 'review only issues which are argued specifically and distinctly . . . .'" (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). This Court will abide by the binding precedent of the Ninth Circuit in *United States ex el. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993). In *Kelly*, the Ninth Circuit held that the *qui tam* provisions in the FCA are constitutional and do not violate the aspects of the Constitution referred to by Defendants. *Id.*

### B. Count III - Conspiracy

Count III of the SAC asserts a conspiracy to violate provisions 31 U.S.C. § 3729(a)(1)(D) and (G) of the FCA. Section 3729(a)(1)(C) creates liability for any person who "conspires to commit a violation" of the FCA. General civil conspiracy principles apply to conspiracy claims under the FCA. *See U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir. 1999); *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991). Civil conspiracy is defined as "a combination of two or more persons who, by some

concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999)). To state a claim of conspiracy under the FCA, Relator must allege "that the conspiring parties 'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Id.*

Moving Defendants argue that Relator fails to allege facts sufficient to support a conspiracy claim under the FCA. In response, Relator argues that Defendants engaged in an "agreed-to plan to *not* report and return the overpayments to AHCCCS . . . and instead retain them, with the spoils divided between MC and TS." (Doc. 41 at 16). He alleges that the multiple meetings between Mercy Care and Touchstone culminating in a signed agreement where Mercy Care unlawfully "forgave" $900,000 in overpayments resulted in decreasing an obligation owed to the government and unlawful conversion of government-owned funds. (*Id.*)

The SAC contains multiple allegations that Touchstone executives purposely deceived Mercy Care and concealed information in the course of their negotiations which deeply cuts against an allegation that the two companies were in a conspiracy together. (Doc. 36 at 47–48 (alleging Touchstone executives "delighted in sneakily getting Mercy Care to release Touchstone's obligation to repay a million dollars"); *see also id.* at 35, 40 ¶¶ 176–77, 199 (alleging other Touchstone deceptions on Mercy Care)). The SAC admits that Touchstone contended Mercy Care had underpaid claims in the amount of $1 million. (*Id.* at 39 ¶ 196). The SAC admits that Mercy Care forgave $900,000 in order to settle the $1 million in underpaid claims, not to defraud the government. *See in re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*. Here, plaintiffs' allegations remain stuck in 'neutral territory'. . . ."). Moreover, Relator does not plead any facts indicating Mercy Care did not return to AHCCCS the $900,000 paid by

Touchstone or that Mercy Care engaged in a scheme to allow Touchstone to retain overpayments. To the contrary, the SAC alleges Touchstone defrauded Mercy Care by hiding the $1 million discrepancy in deferred revenue. "[T]o adequately allege an FCA conspiracy, it is not enough for [Relator] to show there was an agreement that made it likely there would be a violation of the FCA; [he] must show an agreement was made in order to violate the FCA." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017) (citing *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 27 (2d Cir. 2016)). Here, Relator has not sufficiently pleaded that the negotiations and agreement between Mercy Care and Touchstone were made to avoid an obligation to the government or convert government funds. The Court therefore dismisses Count III in its entirety.

### C.     Count IV – Conversion

Relator alleges both Mercy Care and Touchstone are liable under the FCA's conversion provision, which imposes civil liability on anyone who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). As previously stated, "knowingly" is defined as having actual knowledge of information or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b)(1).

#### i.     Mercy Care

Mercy Care argues that Relator's conversion claim should be dismissed because "the SAC does not allege that *Mercy Care* had possession, custody, or control of the funds. It alleges *Touchstone* did." (Doc. 38 at 16). It cites a number of common law cases that it argues confirm that a contractual right of payment is not sufficient to sustain a claim for conversion. It is clear that Mercy Care did not have possession or custody of the funds at issue. The term "control" is not defined in the FCA, and little case law exists to help define the term in the context of FCA claims. The fact that Mercy Care and Touchstone operate as separate financial entities weighs towards treating the funds as a contractual obligation that Mercy Care did not have control over. However, Mercy Care remains responsible for

compliance with all contract requirements and delegation of requirements (and federal funds) does not absolve Mercy Care of its responsibilities, (Doc. 36 at 14). Thus, the Court finds Mercy Care exercised the requisite control over the funds at issue sufficient to survive a motion to dismiss on this prong of this claim.

However, Relator still must plead that Mercy Care knowingly delivered less than all of the disputed funds to the government to survive a motion to dismiss. The SAC does not provide any factual support for the notion that Mercy Care did not return funds it was required to return to AHCCCS. There are no facts about the details of Mercy Care and AHCCCS's reconciliation process beyond conclusory conjecture that Mercy Care exceeded the 60-day rule. *See in re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*. Here, plaintiffs' allegations remain stuck in 'neutral territory'. . . ."). Additionally, Mercy Care and Touchstone engaged in negotiations for Mercy Care to obtain the overpayments Mercy Care identified presumably to return that money to AHCCCS. The fact that Touchstone concealed additional deferred revenue from Mercy Care negates the idea that Mercy Care "knowingly" delivered less than all of the money owed back to the government. If Mercy Care did deliver less than what it should have delivered in both the $2.8 million and $476,227 instances, it did so as a result of fraud perpetuated upon it, not of its own accord. Accordingly, the Court dismisses Count IV against Defendant Mercy Care.

### ii. Touchstone

Touchstone argues that Count IV should be dismissed against it because "Plaintiff fails to plead that Mercy Care was required to return overpayments to AHCCCS . . . . At most, Plaintiff only alleges that Touchstone retained overpayments that belonged to Mercy Care." (Doc. 39 at 9). Although fraud is not part of a conversion claim under the FCA, Relator pleads a course of conduct by Touchstone that is grounded in fraud. He therefore needs to satisfy the Rule 9(b) particularity requirement. *Vess*, 317 F.3d at 1104–05. Relator

has met this burden. He has stated with particularity that Touchstone retained government funds in the amounts of $300,000, $1 million, and $476,227. He has provided specific dates and specific meetings he attended where he learned about deferred revenue that was the property of the government and should have been returned to Mercy Care. He has alleged multiple conversations between Touchstone executives that made clear they were attempting to hide deferred revenue from Mercy Care and make sure they did not have to pay Mercy Care back despite knowing the funds needed to be returned. Relator has pleaded facts sufficient to support Touchstone having possession of funds owned by the government and knowingly delivering or causing to be delivered less than all of those funds. These allegations are sufficient to state a claim against Touchstone. The Court therefore denies Defendant Touchstone's motion to dismiss Count IV for conversion.

### D.   Count V – Reverse False Claim

Relator alleges that both Mercy Care and Touchstone are liable under the FCA's reverse false claim provision which creates civil liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). As a threshold issue, Touchstone asserts that "any alleged failure to return overpayments to Mercy Care is not actionable under the FCA." (Doc. 39 at 4). As pointed out by the Government in its statement of interest, (Doc. 40 at 4), this is incorrect. The Court agrees with the Fifth Circuit's analysis in *United States v. Caremark, Inc.*, 634 F.3d 808, 815 (5th Cir. 2011). In that case, the government alleged that the defendant made false statements to state Medicaid agencies that allowed the defendant to avoid making payments to the state Medicaid agencies. *Id.* The court endorsed liability under section 3729(a)(7)[1] and explained "the statute does not require that the statement impair the defendant's obligation; instead, it requires that the statement impair '*an* obligation to pay or transmit money or property to

---

[1] This has since been renumbered to 31 U.S.C. § 3729(a)(1)(G).

the Government.'" *Id.* at 817.

### i. Mercy Care

Mercy Care argues that the reverse false claim should be dismissed because "the SAC does not allege facts indicating that Mercy Care made any false statements or omissions to AHCCCS about the funds." (Doc. 44 at 8). Relator claims that Mercy Care "allowed TS to continue retaining [deferred revenue] beyond a reasonable reconciliation period." However, as pleaded in the SAC, Mercy Care engaged in negotiations with Touchstone to recover deferred revenue and settle unpaid claims. (Doc. 36 at 39–40). Relator makes a conclusory statement that Mercy Care failed to return overpayments to AHCCCS but fails to allege any facts to support this conclusion. Relator has failed to allege facts sufficient to support his legal theory that Mercy Care knowingly avoided or decreased an obligation to return money to the government. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Thus, the Court dismisses Count V against Defendant Mercy Care.

### ii. Touchstone

Touchstone argues that the reverse false claim should be dismissed because Relator cannot adequately plead that the funds at issue had to be returned to AHCCCS and then CMS. (Doc. 45 at 5). As it stands, it is unclear whether the funds at issue had to be returned to AHCCCS or they could be retained by Mercy Care as part of the incentives they receive for administering services efficiently. Regardless, this is not dispositive of Touchstone's liability. As stated in *Caremark*, "if the Government is able to prove that Caremark knowingly made false statements to the States knowing that these statements *could* cause the States to impair their obligation to the government, Caremark will be liable under § 3729(a)(7)." 634 F.3d at 817 (emphasis added). The statements and actions of Touchstone alleged by Relator *could* cause Mercy Care to impair its obligation to AHCCCS and thereby impair Arizona's obligation to the federal government. When Touchstone allegedly knowingly concealed $1 million from its negotiations over deferred revenue with Mercy Care, this would cause Mercy Care to deliver less than all of the federal

funds due back to the government and "keep federal funds to which they would not otherwise be entitled." *Id.*; *see also United States ex rel. Hunt v. Merck–Medco Managed Care, L.L.C.*, 336 F.Supp.2d 430, 444–45 (E.D. Pa. 2004); *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F.Supp.2d 1122, 1128–29 (N.D. Okla. 1999). This is sufficient to survive a motion to dismiss. *Id.*

Further, Relator alleges that he was present in meetings where Touchstone executives agreed to not discuss deferred revenue they knew they owed to Mercy Care and thereby AHCCCS. Touchstone executives "found" $300,000 in additional revenue that Relator alleges was on the books as overpayments. The executives allegedly expressly ventured to make sure all deferred revenue obligations were removed in settlement negotiations in the $2.8 million instance with the knowledge there was a discrepancy between the two companies' books. The executives also allegedly discussed waiting for Mercy Care to ask for the $476,227 deferred revenue or attempting to hide it. All of these instances, taken as true, satisfy the particularity requirements of Rule 9(b) that Touchstone knowingly made statements and took actions to conceal funds that could cause Mercy Care and thus the state to impair its obligation to the federal government. Accordingly, the Court denies Defendant Touchstone's motion to dismiss Count V.

## IV. CONCLUSION

Based on the foregoing

**IT IS ORDERED** that Defendant Mercy Care's Motion to Dismiss (Doc. 38) is **GRANTED**. Mercy Care is terminated from this action. Because another Defendant remains, the Clerk of the Court shall not enter judgment at this time.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**IT IS FURTHER ORDERED**, for reasons stated above, that Defendant Touchstone's Motion to Dismiss (Doc. 39) is **GRANTED IN PART** and **DENIED IN PART**. Counts I, II, and III only are dismissed. Touchstone shall answer the remaining counts within fourteen (14) days of the date of this Order.

Dated this 9th day of November, 2023.

_____
James A. Teilborg
Senior United States District Judge