1  **WO**

2

3

4

5

6  ## IN THE UNITED STATES DISTRICT COURT

7  ## FOR THE DISTRICT OF ARIZONA

8

9  United States of America *ex rel.* Craig Thomas,

No. CV-22-00512-PHX-JAT

10                    Plaintiff,

**ORDER**

11  v.

12  Touchstone Behavioral Health,

13                    Defendant.

14

15          Pending before the Court are Touchstone Behavioral Health's ("Touchstone")

16  Motion for Summary Judgment (Doc. 80) and Plaintiff Craig Thomas' ("Relator") Motion

17  for Summary Judgment (Doc. 81), both of which are fully briefed (Docs. 88, 89, 90, 91).

18  The Court now rules.

19  ### I.      BACKGROUND

20          The Arizona Health Care Cost Containment System ("AHCCCS") receives federal

21  funding in the form of Title XIX (Medicaid) payments and block grants from the

22  Community Mental Health Services Block Grant ("MHBG") and the Substance Abuse

23  Block Grant ("SABG") programs. (Doc. 81 at 3). AHCCCS uses this federal funding to

24  contract with Mercy Care, a managed care organization, to operate healthcare plans for

25  eligible individuals. (Doc. 81 at 3). In turn, Mercy Care contracts with Touchstone to give

26  Touchstone federal funding to provide behavioral healthcare services to eligible

27  individuals. (Doc. 80-1 at 2-3, 5). Under those contracts, Mercy Care would pay

28  Touchstone "both Title 19 [Medicaid] and block grant monies *in advance* on a monthly

basis." (Doc. 81 at 3 (emphasis in original); *see also* Doc. 80-1 at 5). Touchstone would then "earn[] that money by providing beneficiaries with specific services, called 'encounters.'" (Doc. 81 at 3; *see also* Doc. 80-1 at 5). If Touchstone "under-encountered"[1] in a given time frame, or had less "encounters" than Mercy Care prepaid for, the result was "deferred revenue,"[2] or money that Touchstone had yet to earn. (Doc. 81 at 3-4). Touchstone would not reclassify "deferred revenue" as "revenue" until Touchstone and Mercy Care reconciled their records. (Doc. 89 at 2). The following individuals from Touchstone and Mercy Care are key actors in this case:

- Touchstone:
  - Craig Thomas: *Qui tam* Plaintiff and Relator, Chief Operating Officer and Director of Compliance. (Doc. 81 at 4).
  - Donn Merrill: Chief Financial Officer ("CFO") from December 2016 to May 2019. (Doc. 81 at 1 n. 3).
  - Lance Monahan: CFO from April 2019 to December 2021. (Doc. 81 at 1 n. 3).
  - Bryan Davey: Chief Executive Officer ("CEO") from September 2016 to November 2019.
  - April Rhodes: CEO from November 2019 to April 2021. (Doc. 80-1 at 7; Doc. 81 at 5).
- Mercy Care:
  - Sherman Moore: Director of Finance. (Doc. 80-1 at 6).
  - Jessica Clemens: Network Administrator. (Doc. 81-34 at 4).

Two events are at the heart of Relator's claims. First, "[o]n or around 2017, Touchstone became aware of $300,000 in deferred revenue related to fiscal year 2014 during the course of its ongoing reconciliation discussions with Mercy Care." (Doc. 80-1 at 6). Second, "[o]n or around 2019, Touchstone identified an additional deferred revenue obligation, totaling approximately $2.8 million." (Doc. 80-1 at 7).

Relator's second amended complaint consisted of five counts of violations of the False Claims Act ("FCA") against Mercy Care and Touchstone. (*See generally* Doc. 36).

---

[1] Per Touchstone: "In this context, an 'under encounter' refers to situations where the actual number of encounters—or services rendered to [] patients—falls short of the estimate encounters used to calculate pre-payments from Mercy Care. Under encounters occur when few[er] qualifying encounters take place than originally projected, leading to potential discrepancies in the amount of money pre-paid by Mercy Care to Touchstone." (Doc. 80-1 at 7 n. 3).

[2] "Deferred revenue is calculated by subtracting the value of the encounters from the amount prepaid." (Doc. 81 at 4). Put differently, "deferred revenue" is "a liability on the balance sheet." (Doc. 89 at 2).

Relator voluntarily dismissed Counts I and II against both Mercy Care and Touchstone. (Docs. 41, 42). The Court subsequently granted Mercy Care's Motion to Dismiss and terminated Mercy Care from this action. (*See generally* Doc. 48). The Court also granted Touchstone's Motion to Dismiss in part, dismissing Count III against Touchstone. (*See generally* Doc. 48). Relator's Count IV (Conversion) and Count V (Reverse False Claim) claims remain. Relator and Touchstone have filed cross-motions for summary judgment on both remaining claims. (Docs. 80, 81).

## II.   LEGAL STANDARDS

### a.  Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co.*, Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see also* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

### b.  False Claims Act

The FCA, 31 U.S.C. §§ 3729 *et seq.*, generally provides for "the recovery of civil penalties from those who knowingly present a false or fraudulent claim to the federal government for payment, or knowingly use a false record to avoid or decrease an obligation to pay the federal government." *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1467 n.1 (9th Cir. 1996). The Supreme Court has held that the FCA is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, . . . to [] all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968); *see also United States v. McLeod*, 721 F.2d 282, 284-85 (9th Cir. 1983). The current version of the FCA is one that Congress amended in 2009. Specifically, Congress modified the FCA to increase its effectiveness by broadening the scope of the law to include "subcontractors paid with Government money" and prevent them from "escap[ing] responsibility for proven frauds." S. Rep. 111-10, 4, 2009 U.S.C.C.A.N. 430, 433.

The FCA authorizes individuals (relators) to file civil suits known as "*qui tam* actions" on behalf of the federal government against persons who violate the FCA. 31 U.S.C. § 3730. Violations of the FCA include, but are not limited to, (1) when a person has possession, custody, or control of property or money used, or to be used, by the

Government and knowingly delivers, or causes to be delivered, less than all of that money or property; and (2) when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(D), (G). The FCA defines "knowing" as having actual knowledge of information or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b)(1).

## III. DISCUSSION

Relator and Touchstone have both moved for summary judgment on Relator's two remaining claims: Count IV (Conversion) and Count V (Reverse False Claim). Each claim is discussed in turn below.

### a. Count IV: Conversion

Relator alleges Touchstone is liable under the FCA's conversion provision, which imposes civil liability on anyone who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). As previously stated, "knowingly" is defined as having actual knowledge of information or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b)(1).

The first question is whether Touchstone had possession, custody, or control of money used, or to be used, by the Government. The answer is clearly yes. At the very least, Touchstone had possession of some amount of money used, or to be used, by the Government. Touchstone concedes that it received federal Medicaid and block grant funding.[3] (*See, e.g.,* Doc 80-1 at 5 ("In 2014, Touchstone and Mercy Care entered into a

---

[3] Touchstone executives also understood that the money Touchstone received could be traced back the AHCCCS and the Government. In one audio recording, the admissibility of which is discussed below, Mr. Monahan (Touchstone CFO) said that AHCCCS is "kind of like the federal government." (Doc. 87-1 at 8). Mr. Monahan also understood that Mercy Care "report[ed] [] back to AHCCCS." (Doc. 87-1 at 15).

contractual relationship under which Touchstone received [] Title XIX [Medicaid] and Block Grant payments for providing behavioral healthcare services to Medicaid beneficiaries."); Doc. 89 at 2 ("Touchstone receives both Title-19 (Medicaid) and block grant funding.")). The contract between Touchstone and Mercy Care also references government funds. (*See, e.g.,* Doc. 88-5 at 5 ("With respect to Members of Government Programs, [Touchstone] acknowledges that compensation under this Agreement for such Members constitutes receipt of Federal funds.")).

The next question is whether Touchstone knowingly delivered, or caused to be delivered, less than all of that money.[4] Touchstone does not dispute that it delivered Mercy Care less than the amounts Touchstone initially identified as "deferred revenue."[5] For example, Touchstone admits that "Mercy Care ultimately recognized only $1.8 million of the total $2.8 million liability." (Doc. 80-1 at 12). Because "deferred revenue" is by definition money that Mercy Care received from AHCCCS, "deferred revenue" is Government money.

Nonetheless, Touchstone seemingly argues that this element is not met because Touchstone and Mercy Care, through the "reconciliation" process, reached an agreement as to the amount of "all" of the money, and Touchstone delivered *that* amount. (*See, e.g.,* Doc. 80-1 at 4 ("[O]nce an overpayment was determined [through reconciliation,] Touchstone paid it in accordance with the agreement it had with Mercy Care."); Doc. 80-1 at 12 ("Further, and more notably, all overpayments/underpayments were eventually acknowledged and addressed in the reconciliation discussions, with Touchstone agreeing to repay a portion of the funds."); Doc. 89 at 2-3 ("Only when reconciliation was complete and the parties c[a]me to an agreement could [it] be determined what amount, if any, was to be returned to Mercy Care.")). In other words, Touchstone argues that "all" was

---

[4] The Court notes that it is nondispositive that Touchstone was not required to deliver the money to the Government directly, but rather through the middleman of Mercy Care. *See* discussion *infra* Section III.b.i.1 (discussing how Congress amended FCA to specifically apply to subcontractors).

[5] Although Touchstone paid more than $300,000 in its first settlement agreement, Touchstone ultimately does not provide evidence to show that the $300,000 was encountered or otherwise accounted for. Thus, Touchstone did not show that it "delivered" this money to Mercy Care.

redefined through the reconciliation process it undertook with Mercy Care. The Court cannot agree with this argument.

First, the term "reconciliation," as used here, has a meaning grounded in accounting. In an accounting context, reconciliation generally refers to "[a]n adjustment of accounts so that they agree." *Reconciliation*, *Black's Law Dictionary* (12th ed. 2024). Here, Relator has produced evidence, as discussed below, that Touchstone understood that Mercy Care was adjusting its accounts in a way that *did not agree* with the numbers that Touchstone had. Thus, at the highest level, it is questionable whether Mercy Care and Touchstone truly participated in a reconciliation.

Moreover, the Court cannot agree with Touchstone that reconciliation merely requires an agreement, regardless of whether that agreement is based on incorrect numbers or false premises. A core principle of the Generally Accepted Accounting Principles ("GAAP") is that of "utmost good faith." "Good faith" generally means "[b]ehaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage." *Acting in Good Faith*, *Black's Law Dictionary* (12th ed. 2024). Relator has produced evidence, discussed below, that suggests Touchstone sought an unconscionable advantage in its reconciliation interactions with Mercy Care. Again, it is questionable whether this reconciliation was sufficient. And although Mercy Care did agree to the settlement amounts, the Court has not found anything that indicates that Mercy Care had the authority to "forgive" or "discount" the amount of money that Touchstone owed vis-à-vis the Government and the FCA.

Finally, logic dictates that Touchstone's concept of "reconciliation" is not correct. Under Touchstone's line of reasoning, Mercy Care, via the reconciliation process, can absolve Touchstone from liability for conversion, even if the elements are otherwise met. Taken to a logical extreme, Touchstone seems to suggest it would be permissible for Touchstone to identify deferred revenue of $10 million and, through "reconciliation," deliver $1 back to Mercy Care—so long as Mercy Care agrees. According to Touchstone, once the reconciliation box is checked, Touchstone is only obliged to pay the agreed-upon

amount. This cannot be what Congress intended, especially in light of Congress' explicit desire to expand liability under the FCA.

The Court finds that the "reconciliation" that occurred in this case was deficient from an accounting standpoint and it did not change the definition of the amount of "all." Touchstone "knowingly" delivered, or caused to be delivered, "less than all" of the Government's money, and no statute or case permits Touchstone to do this based simply on Mercy Care "agreeing" to this result, irrespective of whether Mercy Care entered such an agreement knowingly, or blindly.

### i. Conversion Conclusion and Damages Discussion

Accordingly, Touchstone's motion for summary judgment is denied as to the conversion claim. With respect to Relator's cross-motion for partial summary judgment, the Court cannot find that Relator established that he is entitled to judgment as a matter of law. Although Touchstone either admitted, or the Court found evidence that establishes, several elements of a conversion claim, Relator did not establish damages. The Court, despite its best efforts without any briefing from the parties regarding damages,[6] cannot sever damages from liability. Although the FCA states that "the United States shall be required to prove all essential elements of the cause of action, *including damages*, by a preponderance of the evidence," 31 U.S.C. § 3731(d) (emphasis added), in some circumstances, the Court of Appeals has expressed that "[l]iability attaches upon proof that a false claim for payment was made, *regardless of whether the government suffered actual damage*." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 674 (9th Cir. 2018) (emphasis added). Similarly, under the FCA, it appears that a "civil penalty" can be awarded regardless of whether the Government sustained damages. *See* 31 U.S.C. § 3729(1) ("[a person who violates the FCA] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount

---

[6] On summary judgment, neither party briefed the method of calculating the Government's award in this case; the Court understands that a sufficient reconciliation process might have resulted in a different settlement amount, but the Court has no way of knowing that amount. Furthermore, neither party briefed the issue of the amount of funds that Mercy Care was required to return to the Government; the Court understands that in some scenarios, Mercy Care could keep a portion of the funds.

of damages which the Government sustains because of the act of that person."); *U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (finding "[n]o damages need[ed] to be shown in order to recover the [civil] penalty" in FCA case). Neither party briefed the issue of whether a relator can recover the civil penalty if no actual damages are shown.

In conclusion, although the Court found the reconciliation deficient such that the process could not have determined the amount that Touchstone owed Mercy Care, the Court cannot determine what amount a proper reconciliation might have resulted in, nor what damages the Government is entitled to. Thus, on this record, the Court cannot grant summary judgment on liability because while it appears that Touchstone delivered "less than all" of the Government's money to Mercy Care, the Court cannot conclude that, as a matter of law, liability attaches without knowing if there was actual damage or harm based on what was actually refunded to the Government (which remains unknown to the Court). Accordingly, both parties' motions for summary judgment on conversion are denied.

**b. Count V: Reverse False Claim**

Relator alleges that Touchstone is liable under the FCA's reverse false claim provision, which creates civil liability for a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Specifically, Relator alleges that Touchstone is liable under the second prong of this provision, which imposes liability on a defendant who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money . . . to the Government."[7] 31 U.S.C. § 3729(a)(1)(G).

---

[7] A plain reading of the statutory text leads this Court to find that a false record or statement is not required for liability under the second prong of the reverse false claim provision. This reading is supported by the legislative history of the FCA. In 2009, Congress expanded the scope of the FCA via the Fraud Enforcement and Recovery Act ("FERA"). S. Rep. 111-10, 10, 2009 U.S.C.C.A.N. 430, 437. Before FERA, the FCA's reverse false claim provision imposed liability on any defendant that "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C.

1

### i.  "An obligation to pay or transmit money to the Government"

2      The FCA defines "obligation" as "an established duty, whether or not fixed, arising

3  from an express or implied contractual, grantor-grantee, or licensor-licensee relationship,

4  from a fee-based or similar relationship, from statute or regulation, or from the retention of

5  any overpayment." 31 U.S.C. § 3729(b)(3).

6

### 1.  "Indirect" Reverse False Claim

7      Touchstone first argues that it did not have any "obligation to pay or transmit money

8  to the Government" because "Mercy Care, not Touchstone, was the entity responsible for

9  managing Medicaid payments and ensuring that any overpayments to Touchstone were

10  returned to AHCCCS." (Doc. 80-1 at 14).

11     Although not directly addressed within the Ninth Circuit, other courts have allowed

12

13  § 3729(a)(7) (1994). This pre-FERA version of the provision clearly requires "a false
   record or statement." However, this is not the case after the FERA amendments. Congress

14  amended the reverse false claim provision to read: "knowingly makes, uses, or causes to
   be made or used, a false record or statement material to an obligation to pay or transmit

15  money or property to the Government, **or** knowingly conceals or knowingly and
   improperly avoids or decreases an obligation to pay or transmit money or property to the

16  Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). The current statutory text, read
   in tandem with Congress' intent to broaden the scope of the law, supports the Court's

17  reading that a false record or statement is not required for liability under the second prong
   of the provision.

18     Numerous other courts agree with this post-FERA reading. *See, e.g., United States
   ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir.

19  2016) ("A false statement is no longer a required element, since the post-FERA FCA
   specifies that mere knowledge and avoidance of an obligation is sufficient, without the

20  submission of a false record, to give rise to liability."); *U.S. ex rel. Yannacopoulos v. Gen.
   Dynamics*, 652 F.3d 818, 835 n. 16 (7th Cir. 2011) (finding 2009 amendments broadened

21  reverse false claim to apply "regardless of whether such actions involve a falsehood.");
   *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th

22  Cir. 2017) (finding 2009 amendments "added a second route to liability" that "expands on
   the first by not requiring a 'false record or statement'"); *Miller v. United States ex rel.

23  Miller*, 110 F.4th 533, 542 (2d Cir. 2024) (finding reverse false claims provision includes
   three theories of liability and "[n]ot all three [] require an affirmative representation");

24  *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1056 (N.D. Cal. 2020)
   ("There is no requirement under the second prong to show that the defendant used a false

25  record or statement or that a record or statement was material").
       While Relator points out that *U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 336 (9th

26  Cir. 2017), quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir.
   2011), found that "[t]he 'reverse false claims' provision does not eliminate or supplant the

27  FCA's false claim requirement," *Cafasso* was based on the pre-FERA FCA because the
   events in *Cafasso* took place prior to the enactment of FERA. *See also Dep't of Emp.

28  Training & Rehab. ex rel. Chagolla v. Lyft, Inc.*, No. 3:23-CV-00442-ART-CLB, 2024 WL
   4349314, at *4 (D. Nev. Sept. 30, 2024) (discussing how the FCA was amended post-
   *Cafasso* such that a false statement is not required).

liability for "indirect" reverse false claims where the defendant is a third party that impacts "an obligation" between another party and the Government. For example, in *Caremark*, the Fifth Circuit concluded that the district court erred in granting summary judgment to the defendant on an indirect reverse false claim because the fact that the defendant's actions "*could have* caused the state Medicaid agencies to impair their obligations to the Government" was enough to create a disputed issue of fact. 634 F.3d at 817 (emphasis added); *see also United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018) ("The FCA does not require that the obligation to pay or transmit money to the Government be the defendant's obligation—rather, the provision applies whenever a defendant has decreased '*an* obligation' to pay the Government."); *United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004) ("The fact that [the defendant] may not have been in direct contractual privity with the Government, therefore, is not an automatic bar to [reverse false claim] liability.").

The concept of an "indirect" reverse false claim is also clearly in line with Congressional intent. In amending the FCA in 2009, Congress explicitly wrote that the amendments were in response to "court decisions limiting the scope of the law and allowing subcontractors . . . to escape responsibility for proven frauds." S. Rep. 111-10, 10-11, 2009 U.S.C.C.A.N. 430, 437-38. Congress made clear that it intends liability under the FCA whenever a person runs afoul of the FCA, "without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." *Id.*  Thus, it is clear Congress intended the FCA apply to parties like Touchstone who may not "negotiate with the government or report to the government," (Doc. 80-1 at 4), but are "subcontractors paid with Government money."

In conclusion, because Touchstone's actions *could have* caused Mercy Care to impair its obligations to repay unused Medicaid and block grant funds back to the Government, the Court will not grant Touchstone summary judgment. However, recognizing that both parties included additional arguments, the Court will continue its

1    analysis.

2        Relator argues Touchstone had an obligation because Touchstone had "an

3    established duty . . . arising from the retention of any overpayment."[8] (Doc. 81 at 16-17).

4    The FCA does not define "overpayment." However, in amending the FCA in 2009,

5    Congress noted that including "the retention of an overpayment" in the new definition of

6    "obligation" would "be useful to prevent Government contractors and others who receive

7    money from the Government incrementally based upon cost estimates from retaining any

8    Government money that is overpaid during the estimate process." S. Rep. 111-10, 15, 2009

9    U.S.C.C.A.N. 430, 442. "Thus, the violation of the FCA for receiving an overpayment may

10   occur once an overpayment is knowingly and improperly retained, without notice to the

11   Government about the overpayment." *Id.*

12       Here, Touchstone receives money from the Government (through Mercy Care), and

13   Mercy Care pre-paid Touchstone the money based on "estimates made by Mercy Care of

14   the anticipated annual qualifying treatments . . . a particular provider would perform."

15   (Doc. 80-1 at 3). If Touchstone provided less of those treatments than estimated, there was

16   an "overpayment" that Touchstone reported as "deferred revenue." (Doc. 80-1 at 3). These

17   overpayments seem to be the same overpayments contemplated by Congress; Touchstone's

18   "deferred revenue" is Government money that it received based on cost estimates, and

19   those estimates resulted in an overpayment. Thus, Relator has offered enough evidence to

20   create a disputed issue of fact on his theory of liability that Touchstone had an obligation

21   to return the overpayments, or "deferred revenue," at issue in this case and Touchstone

22   "knowingly and improperly retained" that money, without notice to the Government,

23

---

24   [8] Relator later states that Touchstone's obligation stemming from its retention of an
     overpayment is not "the *only* FCA-actionable overpayment[] or obligation[]" but Relator
25   does not make an alternative argument past pointing to Touchstone's "contractual
     obligation" to return unearned Government funds. (Doc. 91 at 4). Nonetheless, the Court
26   recognizes that it is possible that there are multiple sources of Touchstone's obligation to
     return Medicaid funds. (*See, e.g.,* Doc. 81-20 at 3 (copy of Mercy Care monitoring report
27   that states that AHCCCS "requires that all Title 19 [Medicaid] revenue be encountered for
     by appropriate authorized Title 19 [Medicaid] expenditures or returned to Mercy . . .
     Care."); Doc. 80-1 at 4 (Touchstone states that "[t]he funds at issue were subject to the
28   Mercy Care and Touchstone contractual relationship.")). Regardless, because the Court
     does not grant summary judgment, the Court need not analyze all possible sources.

thereby violating the FCA reverse false claim provision.[9]

However, Touchstone argues that the term "overpayment" should be interpreted under the Patient Protection and Affordable Care Act ("ACA"),[10] and that under such an interpretation, the amount of "overpayments" that Touchstone was "obligated" to return was determined through reconciliation. Because Touchstone paid the settlement amounts resulting from reconciliation to Mercy Care, Touchstone argues it fulfilled its "obligation." (Doc. 80-1 at 11-12). This analysis, applicable only to the extent that the "overpayments" included Medicaid funds, as opposed to block grants, continues below.

## 2. Medicaid Funds

Under the ACA, an "overpayment" is "any funds that a [provider] receives or retains under . . . [Medicaid] to which the [provider], after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B). If the overpayment is not "reported and returned" within 60 days of identification, the overpayment becomes an "obligation" for purposes of the reverse claim FCA provision. 42 U.S.C. § 1320a-7k(d)(3).

Touchstone argues that the deferred revenue amounts initially identified cannot be classified as "overpayments," and thereby are not "obligations," because these amounts did not remain "after applicable reconciliation," and the amounts that did remain after reconciliation were promptly paid by Touchstone. (*See, e.g.*, Doc. 80-1 at 14 ("The evidence here demonstrates that Touchstone was apprised of an overpayment and came to an agreement with Mercy Care following their notice of the overpayment. Following their agreement, Touchstone timely paid the amounts due as agreed.")). This argument parallels

---

[9] This is true for both Medicaid and block grant funds.

[10] Other courts have used the definitions from the ACA to interpret the FCA. *See, e.g.*, *United States ex rel. Ginger v. Ensign Grp., Inc.*, No. 815CV00389JWHDFMX, 2022 WL 4110166, at *10 (C.D. Cal. Mar. 10, 2022) ("[C]ourts have allowed reverse false claims to proceed when they concern an obligation under Medicaid or Medicare."); *United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938, 952 (N.D. Cal. 2021); *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1119 (D. Haw. 2021); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1056, 1061 (N.D. Cal. 2020); *United States ex rel. Dunlap v. Alaska Radiology Assocs., Inc.*, No. 3:14-CR-00143-TMB, 2016 WL 11786411, at *6 (D. Alaska Mar. 31, 2016) ("[A] recipient of an overpayment from Medicare or Medicaid, who after "identifying" that overpayment, knowingly fails to report and return it within 60 days, has committed a reverse false claim.").

1   Touchstone's conversion argument; Touchstone essentially argues that the reconciliation
2   process was sufficient to determine the amount of the "overpayment" that Touchstone was
3   obligated to report and return to Mercy Care before it became an "obligation." The Court
4   again finds that Touchstone cannot be absolved by the reconciliation process on this record
5   because fact issues remain regarding whether there was full disclosure and good faith
6   within the reconciliation process.

7       The Court incorporates its above analysis regarding reconciliation, and adds the
8   following: Congress, in including "the retention of an overpayment" in the definition of
9   "obligation," understood that "various statutory and regulatory schemes in Federal
10  contracting allow for the reconciliation of cost reports that may permit an unknowing,
11  unintentional retention of an overpayment." S. Rep. 111-10, 15, 2009 U.S.C.C.A.N. 430,
12  442. Already Touchstone runs afoul of this provision; evidence points to a knowing,
13  intentional retention of an overpayment. Congress also noted that "any action or scheme
14  created to intentionally defraud the Government by receiving overpayments, *even if within*
15  *the statutory or regulatory window for reconciliation*, is not intended to be protected by
16  this provision." S. Rep. 111-10, 15, 2009 U.S.C.C.A.N. 430, 442 (emphasis added). In
17  other words, Congress did not intend the loophole that Touchstone suggests.
18  Reconciliation, even if within the statutory or regulatory window, does not act to absolve
19  Touchstone of liability. *See also Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370,
20  391 (S.D.N.Y. 2015) ("Defendants' proposed reading of the ACA would frustrate
21  Congress's intention to subject willful ignorance of Medicaid overpayments to the FCA's
22  stringent penalty scheme.").[11]

---

[11] The Court finds the *Kane* court's full analysis especially on point:

> Congress expressly created FCA liability for the retention of Medicaid overpayments in the ACA. By requiring providers to self-report overpayments and imposing a relatively short deadline for repayments, violation of which risks the severe liability of the FCA, Congress intentionally placed the onus on providers, rather than on the Government, to quickly address overpayments and return any wrongly collected money. This reading is in line with the legislative purpose of the FCA, the 1986 FCA amendments, and the FERA, which together reflect Congress's more than 150-year commitment to deterring fraud against the federal government and ensuring that Government losses due to fraud are recouped in a timely fashion. Based on this understanding of legislative purpose, Defendants' proposed reading of the ACA would frustrate Congress's intention to subject willful ignorance of

### 3. Federal Block Grants

Touchstone followed the same reconciliation and negotiation process for block grant funds as it did for Medicaid funds. (Doc. 80-6 at 11). Additionally, Mr. Monahan, Touchstone's CFO, affirmed that Touchstone had to return any "overpayment [that] reflects money from a government-funded healthcare plan, like Medicaid *or a federal block grant*." (Doc. 81-7 at 10 (emphasis added)). Thus, it appears to be undisputed that some portion of the block grant funds, like the Medicaid funds, had to be returned if there was an overpayment.

### 4. Conclusion: Obligation Element

Touchstone had an obligation because it had an established duty that arose from its retention of overpayments of both Medicaid and block grant funds. This conclusion is in line with the statutory text of the FCA, the legislative purpose behind the 2009 amendments, and the ACA. It is irrelevant that Touchstone interacted with Mercy Care instead of the Government directly, and it is also irrelevant that Touchstone and Mercy Care engaged in a reconciliation process, because that process was not sufficient.

### ii. "Knowingly conceals or knowingly and improperly avoids or decreases"

The question becomes whether Touchstone (1) *knowingly concealed* an obligation to pay or transmit money or property to the Government, (2) *knowingly and improperly avoided* an obligation to pay or transmit money or property to the Government, or (3) *knowingly and improperly decreased* an obligation to pay or transmit money or property to the Government.

### 1. Obligation 1: $300,000

Relator provides a detailed account of the origins of Touchstone's $300,000 obligation. (Doc. 81 at 6-8, 14-16). The Court understands the most relevant facts to be as follows:

- Touchstone concedes that "[o]n or around 2017, Touchstone became aware of $300,000 in deferred revenue." (Doc. 80-1 at 6).

Medicaid overpayments to the FCA's stringent penalty scheme. *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 391 (S.D.N.Y. 2015).

- Relator will testify that he had a meeting with Mr. Davey (then-CEO) and Mr. Merrill (then-CFO) in which Mr. Davey said Mr. Merrill found $300,000 "just sitting around." (Doc. 81-12 at 2-3). Mr. Davey said he has no reason to dispute Relator's recollection of that event. (Doc. 81-10 at 5-6).
- June 1, 2017: An accounting supervisor at Touchstone emailed Mr. Merrill a report that showed numbers for fiscal year 2015. (Doc. 81-14 at 1). The report listed the total funding received as $9,**8**43,134. (Doc. 81-14 at 4).
- July 25, 2017: A senior accountant at Touchstone emailed Mr. Merrill a table that listed the total funding for fiscal year 2015 as $9,**5**43,134. (Doc. 81-16 at 2, 3). Later that same day, the same senior accountant emailed the same table, but this time, the total funding for fiscal year 2015 was listed as $9,**8**44,387. (Doc. 81-17 at 2). After that, still on the same day, Mr. Merrill emailed a group of Mercy Care employees a table that reported that Mercy Care and Touchstone agreed that Touchstone received $9,**5**43,134 in funding for fiscal year 2015. (Doc. 81-19 at 1). In that email, Mr. Merrill stated that Touchstone "would be happy to provide [Mercy Care] with the detail of [Touchstone's] paid claims" for review. (Doc. 81-19 at 1).
- July 26, 2017: A senior accountant at Touchstone provided Mr. Merrill with a copy of Touchstone's "funding monitoring report" that reported Touchstone's "total funding" amount for fiscal year 2015 at $9,**8**44,387. (Doc. 81-20 at 3).
- August 10, 2017: An accountant at Touchstone emailed Mr. Merrill regarding $300,000 of a $600,000 block grant that Touchstone received in the quarter of July to September 2014. (Doc. 81-21 at 1-2). The total funding amount for fiscal year 2015 was listed as $9,**8**44,387.
- August 23, 2017: Mr. Merrill emailed Mr. Davey a table that listed the total funding amount for fiscal year 2015 as $9,**5**44,387. Mr. Merrill noted that "$300k of the $600k funding provided by [Mercy Care]" was excluded. (Doc. 81-22 at 1). On the same day, an accountant at Touchstone emailed Mr. Merrill and explained that the $9.**5** million number included only $300,000 of a $600,000 block grant, the other $300,000 of which "was not received in [Touchstone's] fiscal year of Oct 14 – Sept 15." (Doc. 81-23 at 1).
- Touchstone and Mercy Care ultimately agree to a deferred revenue amount of $1.7 million for fiscal year 2015, to be encountered by Touchstone in fiscal year 2017. (Doc. 81-24 at 2).

Together, these facts show that Mr. Merrill, then-CFO at Touchstone, knowingly received and reported numbers that were $300,000 apart, and that Mr. Davey, then-CEO at Touchstone, was also aware of this. Touchstone responds that it "actively [sought] to resolve the discrepancies" but does not provide evidence that the $300,000 found "sitting around" was ever properly reported to Mercy Care or otherwise accounted for. (Doc. 80-1 at 8). Thus, Relator has created a disputed issue of fact regarding this element for this obligation.

### 2.  Obligation 2: $1 million

Relator has produced seven audio recordings in support of his Obligation 2[12] claims against Touchstone. Touchstone argues these audio recordings are inadmissible. (Doc. 81-1 at 2, 13). Because "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment," *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002), the Court will analyze whether the audio recordings are admissible.

#### a.  Admissibility of Audio Recordings

#### i.  Authentication and Foundation

Unauthenticated evidence cannot be considered in ruling on a motion for summary judgment because authentication is a "condition precedent to admissibility." *Orr*, 285 F.3d at 773. Authentication is satisfied if the proponent "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). A proponent seeking to authenticate evidence through personal knowledge must provide an affidavit "[setting] out facts that would be admissible in evidence" and "show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "In other words, the party offering the evidence must make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (quoting *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir. 1991)). To authenticate an audio recording, "a witness with knowledge may testify that the recording is what it purports to be, or is a true and accurate copy of the original." *Id.* at 1203-04. "The district court does not abuse its discretion in admitting evidence that meets the minimum requirements for authentication."[13] *Id.* at 1204.

Here, Relator submits a declaration in which he avers the following: (1) he

---

[12] Relator makes clear that "[n]o recordings have been offered with respect to Obligation 1." (Doc. 91 at 7). However, the audio recordings are offered with respect to Obligation 2 for both claims (conversion and reverse false claim).

[13] "Once the trial judge determines that there is *prima facie* evidence of genuineness, the evidence is admitted, and the trier of fact makes its own determination of the evidence's authenticity and weight." *Orr*, 282 F.3d at 773 n.6.

personally made the audio recordings with one of his iPhones;[14] (2) he personally participated in and witnessed "each of the interactions which [he] recorded" and "can attest to the circumstances of those interactions;" and (3) the recordings as provided to Relator's counsel "are true and correct copies of the recordings [he] made." (Doc. 88-1 at 1-3). He also describes the circumstances of each recording, including the date, who was present, who spoke, the general subject matter, and the portion of the meeting recorded. (Doc. 88-1 at 3-5). Relator explains that if the recording file "was too large to send electronically," he "clipp[ed] the beginning and/or end from [some] recording[s]" but "did not knowingly or intentionally alter or manipulate the recording contents in any way." (Doc. 88-1 at 2). Three of the audio recordings "were not shortened at all." (Doc. 91 at 9). Although Touchstone raises various arguments under the guise of "authentication," Touchstone ultimately does not dispute that the recordings are what Relator claims they are: recordings of meetings involving various Touchstone employees.[15] Accordingly, the Court is satisfied that the recordings meet the minimum requirements for authentication and foundation.[16]

### ii.  Rule of Completeness

Touchstone argues that the audio recordings and transcripts are inadmissible under the Rule of Completeness. (Doc. 89 at 15). The Rule of Completeness provides that "[i]f a party introduces . . . part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106.

To rebut this argument, Relator quotes *U.S. v. Ehmer*, 87 F.4th 1073, 1125 (9th Cir. 2023). In *Ehmer*, an adverse party objected to the introduction of a portion of a recording

---

[14] Relator references both a "company-issued iPhone" and a "personal iPhone." (Doc. 88-1 at 2).

[15] Notably, "[n]either Monahan nor Rhodes—[Touchstone] 's key speakers on the recordings—denied they were the speakers in statements attributed to them. Nor did they deny speaking the words attributed to them or claim any relevant portions are missing." (Doc. 91 at 10).

[16] Although Touchstone points out some "variances between Relator's recollection of the circumstances of the recordings in his deposition and his declaration," the Court understands that "Relator relied on his memory for such details in his deposition but in preparing his declaration had access to materials to refresh his recollection." (Doc. 91 at 10).

of an interview "because the remainder of the original [recording] . . . 'had not been preserved,' [and] it 'was impossible for either the parties or the trial court to determine whether [the interviewee's] statement, as proffered by the government, had been unfairly excerpted from the original recording.'" 87 F.4th at 1125. The Ninth Circuit held that under the Rule of Completeness, if "the additional recorded statements that the opponent would like to offer *no longer exist*, . . . the opponent lacks any additional statement to which the right of contemporaneous introduction conferred by Rule 106 might attach." *Id.* (emphasis in original). The court goes on to explain that the question of "whether a recorded statement should be admitted, despite its unavoidable incompleteness, instead raises a question of undue prejudice under Rule 403."[17] *Id.*

Here, Touchstone objects to the introduction of the audio recordings because they were "selectively recorded" and "omit[ed] many other conversations." (Doc. 89 at 15). Thus, like the adverse party in *Ehmer*, Touchstone essentially argues that the recordings are inadmissible because the recordings in full have not been preserved and because Touchstone's statements are unfairly excerpted. However, like the additional statements in *Ehmer*, the additional recorded statements that Touchstone would like to offer no longer exist, or in fact never existed. As a result, there is no additional statement to which Rule 106 might attach.

Touchstone also argues that the audio recording transcripts are inadmissible because they "are incomplete as they do not capture the full produced recordings and contain segments deemed inaudible by the transcriber." (Doc. 89 at 15). The Court understands that Touchstone has had copies of the audio recordings since April 2023. (Doc. 91 at 10). If Touchstone wanted transcripts of the audio recordings as produced, it was Touchstone's prerogative to do so. That Relator only submitted relevant portions of the transcripts is no different than Touchstone submitting relevant portions of depositions.

---

[17] Touchstone does argue that "[t]he produced audio recordings should also be excluded and deemed inadmissible under Fed. R. Evid. 403 because the probative value substantially outweighs the danger of unfair prejudice to Touchstone." However, for many of the same reasons already discussed, the Court finds that the probative value of the evidence outweighs the prejudicial effect against Touchstone.

### iii. Portion of Transcripts Denoted as "Indiscernible"

Regarding any portion of the transcripts denoted as "indiscernible," "[a] recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy."[18] *United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975). Out of 46 *pages* of transcripts, there are 11 instances of "indiscernible" audio. (*See generally* Doc. 87). The indiscernible portions appear to be single words, fractions of sentences, or situations where two people spoke over one another. (*See generally* Doc. 87). Accordingly, the "indiscernible" portions are not so substantial that the audio recordings, or the transcripts, are untrustworthy. Relator does not appear to hinge his case on any indiscernible portion and Touchstone does not suggest that the indiscernible portions contain audio that might alter the Court's analysis. The Court will not refuse to consider the audio recordings on this basis.

### iv. "Best Evidence Rule"

Generally, under the best evidence rule, "[a]n original [] recording . . . is required in order to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." Fed. R. Evid. 1002. However, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. "An original is not required . . . if all the originals are lost or destroyed, and not by the proponent acting in bad faith." Fed. R. Evid. 1004.

Touchstone argues that the audio recordings are inadmissible because they "are not originals, but rather, clippings of recordings transmitted to his attorneys, with the originals having been lost due to turning in his company iPhone with the original recordings contained therein." (Doc. 89 at 14). As discussed above, the Court agrees that Relator has

---

[18] The Ninth Circuit found that a district court did not err in admitting audio recordings where the opponent of the evidence did not show that the recordings "were so uniformly unintelligible that the recordings should not have been presented to the jury." *Gadson*, 763 F.3d at 1205. The Court similarly finds that Touchstone has not shown that the audio recordings were so uniformly "inaudible" that the recordings should not be presented to the jury at trial.

met the minimum requirements for authentication and the Court does not find any other circumstances making it unfair to admit the audio recordings.

### v.  Exhibit-Specific Objections

Touchstone makes additional, exhibit-specific objections. The Court addresses those now.

### 1.  Exhibit 24

Exhibit 24 is a certified transcript of 12 minutes and 49 seconds of a 14 minute and 29 second audio recording. (Doc. 87-1 at 1-17). Touchstone generally objects to the audio recording but does not include a legal basis for such an objection. (Doc. 89 at 10). In fact, the entirety of Touchstone's objection is a one-sentence description of the recording. (Doc. 89 at 10). The Court will consider Exhibit 24.

### 2.  Exhibit 26

Exhibit 26 is a certified transcript of 21 seconds of a 30 minute and 17 second audio recording. (Doc. 87-2 at 1-3). Again, Touchstone generally objects to the audio recording but does not include a legal basis for such an objection. (Doc. 89 at 10). Although Touchstone raises various other complaints about this exhibit, the complaints center on who exactly remembers what from the meeting. As discussed above, now that the Court has determined that there is *prima facie* evidence of genuineness, the Court will consider the evidence. Touchstone's complaints in this respect are pertinent to the trier of fact's determination of the authenticity and weight of the evidence. However, these non-legal objections are not a basis to wholesale preclude the evidence at summary judgment or at trial.  *See Orr*, 285 F.3d at 773 n.6. The Court will not repeat this analysis, but finds it applicable to Touchstone's other, similar complaints to other exhibits.

### 3.  Exhibit 27

Exhibit 27 is a certified transcript of one minute and 41 seconds of a 35 minute and 59 second audio recording. (Doc. 87-3 at 1-4). The Court will address Touchstone's specific objection that "Jessica Clemens, a non-party [] made inadmissible hearsay statements during the meeting." (Doc. 89 at 11). Ms. Clemens is a Network Administrator

at Mercy Care. (Doc. 81-34 at 4). Relator argues that Ms. Clemens' statements are not inadmissible hearsay "because they are not being cited for the truth of the matter asserted, but rather to provide evidence that [Touchstone] was on notice that, from Mercy Care's perspective, the deferred revenue being discussed between Mercy Care and [Touchstone] pertained to $1.7 million deferred revenue from fiscal years 2018 and 2019." (Doc. 91 at 12).

Hearsay, or an out-of-court statement offered to prove the truth of the matter asserted, is not admissible. Fed. R. Evid. 801, 802. "Accordingly, an out-of-court statement is *not* hearsay if offered for any purpose other than the truth of whatever the statement asserts." *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019) (emphasis added). For example, "an out-of-court statement introduced to prove that the person to whom the statement was communicated had notice of something" is not hearsay. *United States v. Lane*, No. CR-12-01419-PHX-DGC, 2013 WL 3716601, at *2 (D. Ariz. July 13, 2013) (citing *Kunz v. Utah Power & Light Co.*, 913 F.2d 599, 605 (9th Cir. 1990)). The Court will therefore consider Ms. Clemens' statements not for the truth of the matter asserted, but to show that Ms. Rhodes (Touchstone CEO) and Mr. Monahan (Touchstone CFO) had notice "that, from Mercy Care's perspective, the deferred revenue being discussed between Mercy Care and [Touchstone] pertained to $1.7 million deferred revenue from fiscal years 2018 and 2019." (Doc. 91 at 12).

### 4.  Exhibit 28

Exhibit 28 is a certified transcript of five minutes and 44 seconds of a 16 minute and 23 second audio recording. (Doc. 87-4 at 1-7). Touchstone objects that this exhibit "contains inadmissible double-hearsay" based on two of Mr. Monahan's (Touchstone CFO) statements. (Doc. 89 at 11). Relator avers that he does not rely on either of the statements in his brief. (Doc. 91 at 12). As such, the Court will also not rely on either of these statements and agrees that this objection is moot.

### 5.  Exhibit 29

Exhibit 29 is a certified transcript of 28 seconds of a 20 minute and 43 second audio

1    recording. (Doc. 87-5 at 1-3). The only speaker is Mr. Monahan (Touchstone CFO). (Doc.

2    87-5 at 2). Touchstone claims Mr. Monahan's statements are "taken out of context." (Doc.

3    89 at 12). This is the extent of Touchstone's objection. However, because Touchstone again

4    does not include a legal basis, there is no objection for the Court to address, and the Court

5    will consider this evidence.[19]

6                              **6.  Exhibit 30**

7         Exhibit 30 is a certified transcript of two portions of a 16 minute and 52 second

8    audio recording: the first portion is 45 seconds long and the second is 54 seconds long.

9    (Doc. 87-6 at 1-4). The Court will address Touchstone's specific objection that "[t]his

10   exhibit contains inadmissible hearsay in the form of statements purportedly made by Mercy

11   Care employees Sherman Moore and Tad Gary."[20] (Doc. 89 at 12). Mr. Moore was Mercy

12   Care's Director of Finance. (Doc. 80-1 at 6). Relator argues that Mr. Moore's statements

13   are admissible for the purpose of showing "that, from Mercy Care's perspective, the

14   deferred revenue being discussed between Mercy Care and [Touchstone] pertained to $1.7

15   million deferred revenue from fiscal years 2018 and 2019." (Doc. 91 at 12). The Court

16   agrees and will consider Mr. Moore's statements not for the truth of the matter asserted,

17   but to show notice of the aforementioned.

18                             **7.  Exhibit 36**

19        Exhibit 36 is a certified transcript of two minutes and four seconds of a 14 minute

20   and 44 second audio recording. (Doc. 87-7 at 1-5). The Court finds its analysis for Exhibit

21   26 applicable here and reaches the same conclusion: the Court will consider Exhibit 36.

22                    **8.  Exhibit 25 (Non-Audio Recording)**

23        Exhibit 25 is "a page from a slide deck prepared by [Mr.] Monahan for the June 24,

24

25   [19] Even if Touchstone's argument that Mr. Monahan's statements were "taken out of
     context" was a sufficient legal objection, Relator rebuts this argument by pointing to Mr.
26   Monahan's admission that he cannot reconcile his statement in the recording (that Mercy
     Care *did not* know about the $2.8 million in deferred revenue) with the statement he made
27   at his deposition, prior to hearing the recording (that Mercy Care *did* know about the $2.8
     million). (Doc. 91 at 13-14). "[S]ince then, [Touchstone] has not offered any additional
28   context in which to understand [Mr.] Monahan's recorded statement." (Doc. 91 at 13).
     [20] The Court did not rely on the statements purportedly made by Mercy Care employee Tad
     Gary in this Order and therefore did not consider the admissibility of such statements.

2020 [Touchstone] Board meeting" (Doc. 91 at 13), that "contain[s] monetary figures purportedly associated with deferred revenue," (Doc. 89 at 12). Touchstone objects to Exhibit 25 but does not explain why. (Doc. 89 at 12). Because there is no objection for the Court to address, the Court will consider this evidence.

### vi.  Conclusion

In conclusion, the Court will consider the audio recordings for purposes of this Order. However, the Court notes that all evidentiary objections to specific pieces of evidence not addressed herein are denied without prejudice to re-raising them, if appropriate, at trial.

### b.  Substantive Analysis Considering Audio Recordings

Touchstone states that it "identified an additional deferred revenue obligation, totaling approximately $2.8 million." (Doc. 80-1 at 7). Touchstone also concedes that the settlement agreement with Mercy Care "forgave $900,000 in deferred revenue and agreed that Touchstone would return $900,000 in deferred funds for a sum of $1.8 million." (Doc. 80-1 at 9). There is clearly a $1 million discrepancy between the initially identified amount ($2.8 million) and the settlement ($1.8 million). Touchstone concedes as much, noting that "[w]hile Touchstone's *internal* records acknowledged a liability of $2.8 million, the company focused its discussions on resolving the matter for $1.8 million, a figure that Mercy Care accepted." (Doc. 80-1 at 8) (emphasis added). Evidence suggests that Mercy Care may have accepted the $1.8 million figure because Mercy Care believed that it was negotiating for a different time period.

The first draft of the settlement agreement, sent by Mercy Care, reflected Mercy Care's intent to reconcile fiscal years 2018 and 2019:

> This letter is intended to serve as the close-out document to fulfill the Mercy Care encounter reconciliation *for the period October 1, 2018, through dates of service September 30, 2019*. Mercy Care has reviewed various data (encounters, financial statements, etc.) *related to CY19* and has deemed that a deferred amount of $900K is appropriate, as to ensure the ongoing operations of Touchstone Behavioral Health.

(Doc. 81-33 at 1 (emphasis added)). In response, Touchstone suggested that the letter read as follows:

> This letter is intended to serve as the close-out document to fulfill the Mercy Care encounter reconciliation *for all prior periods up through dates of service September 30, 2019 (CY19)*. Mercy Care has reviewed various data (encounters, financial statements, etc.) *related to all periods up through CY19* and has deemed that a deferred amount of $900K is appropriate, as to ensure the ongoing operations of Touchstone Behavioral Health.

(Doc. 81-35 at 1 (emphasis added)). Touchstone suggested this change, *knowing* that the amount of deferred revenue for "all prior periods" was actually $2.8 million. This much is clear without any audio recording evidence, which further implicates Touchstone.

In one audio recording exchange, Ms. Rhodes (Touchstone CEO) says that "[t]he older debt isn't going to be current on Mercy Care's books either," and that "it is in [Mercy Care's] interest too to resolve some of these things and not have so much debt." (Doc. 87-1 at 8-9). In the same meeting, Mr. Monahan (Touchstone CFO) says that auditors told him that he needed to leave 2016 and 2017 "on the books" but that Mr. Monahan responded to the auditors that Mercy Care was "not going to come back and pursue the '16 and '17." (Doc. 87-1 at 13). Mr. Monahan suggested that he could possibly "convince" Mercy Care "to forget about it." (Doc. 87-1 at 14).

In a subsequent meeting with Mercy Care, Ms. Clemens, a Network Administrator at Mercy Care, addressed "the request that [Mercy Care] received [from Touchstone] to waive the deferred revenue for, I believe, fiscal year[s] '18 and '19. And – or that – the rough total on that is about 1.7 million dollars." (Doc. 87-3 at 2-3). Again, Mercy Care appeared to be negotiating for 2018 and 2019, but not "all prior periods."

And, in perhaps the most incriminating stretch of dialogue, Mr. Monahan (CFO) said the following:

> What that buys us is, debt forgiveness of 2.8 million dollars sitting on our balance sheet in liabilities. Why 2.8? Why isn't it the 1.7 figure that they are quoting? Well, it is because they are not including 2016 and 2017 deferred revenue. So, any settlement offer, in my mind, would have to say all deferred revenue gone, wiped out, forgiven. That would be – that would be like taking 350,000 and investing it, and getting back 2.8. That is a – that is like a 700% return from day one.
> . . .
> The only number that [Mercy Care has] ever given us . . . was that 1.7 – roughly 1.8 figure. Well, that is all they are concerned about, let's satisfy that concern. But let's also say, no further – what – however we want to word it, however we want to wordsmith it, no additional deferred revenue to be recouped. And you know, that

will satisfy our auditors, if I wipe out 2.8 million dollars. That would clean our balance sheet. That – our balance sheet will be cleaner than it has probable been in 10 years.

. . .

I don't think we say, well, you know, what about '16 and '17? We just say, all past deferred revenue forgiven, not to be recouped. And I think that will be enough for any auditor. Can you – but think about that for a second, 2.8 million dollars gone off our books.

(Doc. 87-4 at 2, 5-6).

The Court need not continue. The audio recording evidence is enough to create a disputed issue of fact on whether Touchstone knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay money to the Government. Neither party is entitled to summary judgment on this obligation.[21]

### c. Touchstone's Audit Reports Argument

At various points, Touchstone argues that it is absolved from liability because Touchstone "share[d] its audit reports with Mercy Care to ensure that nothing [was] being concealed or hidden." (Doc. 80-1 at 6, 11-12; Doc. 90 at 6). Even accepting this as true,[22] the only result is that perhaps the Court was misled in accepting Relator's allegations as true in considering the motions to dismiss.[23] Regardless of whether Mercy Care "actually knew," or "should have known," of the audited numbers, the following can still be true: (1) Touchstone possessed Government money and it delivered less than all of that money, and (2) Touchstone knowingly concealed or knowingly and improperly avoided or decreased

---

[21] The same analysis regarding damages for the conversion claim also applies to the reverse false claim count. *See supra* Section II.a.i.

[22] The Court cannot validate that Mercy Care received these audit reports because no one took any discovery from Mercy Care. Thus, the Court cannot determine if Mercy Care had actual knowledge. Nonetheless, regardless of whether Mercy Care "actually knew," or "should have known," it appears that Touchstone still had the opportunity to knowingly conceal or knowingly and improperly avoid or decrease its obligation, which is conceivably sufficient to meet the "knowingly" element in this context.

[23] Specifically, the Court accepted as true Relator's allegations that Touchstone was not transparent regarding the true amounts of deferred revenue, (*See, e.g.*, Doc. 36 at 35, 38-40), which resulted in the Court dismissing Relator's conspiracy count because Mercy Care could not simultaneously knowingly conspire to do something *and also* be a victim of Touchstone's alleged deception. In other words, the Court accepted Relator's factual allegations as true for purposes of the motions to dismiss, and in accepting those facts as true, the Court concluded that Mercy Care could not be an unknowing-victim and a knowing-co-conspirator. If Relator's allegations that precluded Relator's own claim against Mercy Care are later called into question (and the Court can only say "in question" because neither party took discovery from Mercy Care), Relator is responsible, through his pleadings, for effectively forfeiting the claim.

1    an obligation it had to the Government. In other words, the Court does not believe that

2    Mercy Care's alleged knowledge negates any element of either claim and it is at least

3    conceivable that Relator could meet the elements of both claims. Touchstone is not

4    absolved from liability on Relator's claims based on this argument.

### d. Unclean Hands

6    Touchstone asserts that Relator's claims are barred by the doctrine of unclean hands.

7    (Doc. 80-1 at 15). Relator maintains that Touchstone's argument is inconsistent with Ninth

8    Circuit case law and, alternatively, lacks factual basis. (Doc. 88 at 19).

9    At this juncture, Touchstone attempts to use the doctrine of unclean hands as a

10   complete bar to Touchstone's liability. However, the Court finds that Relator's unclean

11   hands may only limit Relator's eventual award, not bar Touchstone's liability. This finding

12   is grounded in the FCA and in Ninth Circuit caselaw. Under the FCA, regardless of whether

13   the Government intervenes, "if the court finds that the action was brought by a person who

14   planned and initiated the violation . . . upon which the action was brought, then the court

15   may, to the extent the court considers appropriate, reduce the share of the proceeds of the

16   action which the person would otherwise receive."[24] 31 U.S.C. § 3730(d)(3). This strongly

17   suggests that the appropriate time for this argument is at the damages stage, or at the point

18   when the Court considers whether it should "reduce the share of the proceeds of the action."

19   Ninth Circuit case law supports this reading. In *Mortgages, Inc. v. U.S. Dist. Court*

20   *for Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991), the Ninth Circuit explicitly

21   stated that "[t]he FCA is in no way intended to ameliorate the liability of wrongdoers by

22   providing defendants with a remedy against a qui tam plaintiff with 'unclean hands.'"[25]

23   Touchstone "acknowledges" this quote, but responds that under *Cell Therapeutics, Inc. v.*

24   *Lash Grp., Inc.*, 586 F.3d 1204, 1213 (9th Cir. 2009), the FCA does "restrict or prevent

---

[24] Similarly, the Court "may award to the defendant its reasonable attorneys' fees and expenses *if the defendant prevails in the action* and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4) (emphasis added). Clearly, this is not the right juncture for the Court to decide this issue. It is unknown why Touchstone suggests otherwise. (Doc. 80-1 at 15).

[25] The Ninth Circuit also noted that "the framers of the [FCA] recognized that wrongdoers might be rewarded under the Act.'" *Mortgages*, 924 F.2d at 213.

entirely the ability of a relator with unclean hands to collect a qui tam bounty." (Doc. 80-1 at 15). However, following that quote from *Lash* is a citation to the same FCA provision from above, which the Court has already explained is only applicable at a later juncture. The Court will not grant summary judgment to Touchstone on this basis.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED** Defendant Touchstone's Motion for Summary Judgment (Doc. 80) is denied.

**IT IS FURTHER ORDERED** Plaintiff-Relator's Cross-Motion for Summary Judgment (Doc. 81) is denied.

Dated this 13th day of March, 2025.

James A. Teilborg
Senior United States District Judge